# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

COASTAL CONSERVATION ASSOCIATION,

                        Plaintiff,

-vs-                                     Case No.  2:09-cv-641-FtM-29SPC

GARY LOCKE, in his official capacity as Secretary
of the United States Department of Commerce;
THE NATIONAL OCEANIC and ATMOSPHERIC
ADMINISTRATION; THE NATIONAL MARINE
FISHERIES SERVICES,

                        Defendants,

THE GULF OF MEXICO REEF FISH
SHAREHOLDERS' ALLIANCE; THE
ENVIRONMENTAL DEFENSE FUND,

                        Intervenor-Defendants.
_____

BRIAN E. LEWIS; TROY FUSSELL,

                        Plaintiffs,

-vs-                                     Case No. 2:10-cv-95-FtM-29SPC

GARY LOCKE, in his official capacity as Secretary
of the United States Department of Commerce; THE
NATIONAL OCEANIC and ATMOSPHERIC
ADMINISTRATION; THE NATIONAL MARINE
FISHERIES SERVICES,

                        Defendants.
_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This matter comes before the Court on the Plaintiffs, Brian E. Lewis and Troy Fussell's Motion for Summary Judgment concerning their Complaint in case number 2:10-cv-95 (Doc. # 61) filed on November 26, 2010[1]; the Plaintiff Coastal Conservation's Motion for Summary Judgment (Doc. # 64) filed on December 3, 2010; The Defendants, Gary Locke, in his official capacity as Secretary of the United States Department of Commerce, the National Oceanic and Atmospheric Administration; The National Marine Fisheries Services's (Federal Defendants) Cross Motion for Summary Judgement (Doc. # 68) filed on January 14, 2011; and the Intervenor-Defendants, the Environmental Defense Fund, and the Gulf of Mexico Reef Fish Shareholders' Alliance's Motion for Summary Judgment and Response in Opposition to the Plaintiffs' Motions for Summary Judgment (Doc. # 71) filed on January 14, 2011.

The Federal Defendants filed their Response in Opposition to the Plaintiffs' Motions for Summary Judgment (Doc. # 70) on January 14, 2011.  The Plaintiffs, Brian E. Lewis and Troy Fussell filed their Reply Brief (Doc. # 74) to the Federal Defendant's Opposition and Motion for Summary Judgment on January 31, 2011.  The Plaintiff, Coastal Conservation Association filed its Reply Brief (Doc. # 75) on February 4, 2011.  The *Amicus Curiae,* Food and Water Watch, filed its Memorandum of *Amicus Curiae* in Support of the Plaintiffs' Motions for Summary Judgment (Doc. # 67) on December 15, 2010.  The Motions for Summary Judgment are now ripe for the Court's review and recommendation.

---

[1]      On March 4, 2010, the District Court consolidated (Doc. # 37)the Plaintiffs Lewis and Fussell's case number 2:10-cv-95-FtM-29SPC, into the instant case designating this case as the lead case.  All filings thereafter were entered in this case.

## FACTS

Congress delegated to the National Marine Fishery Service (NMFS) through the Magnuson-Stevens Fishery Conservation and Management Act (MSA) 16 U.S.C. § 1801 *et. seq*., by and through the Secretary of Commerce, broad authority to manage and conserve coastal fisheries.  The numerous species of reef fish in the Gulf of Mexico are managed as a complex by the Gulf of Mexico Fishery Management Council (Gulf Council). 16 U.S.C. § 1802(a)(1)(E); 50 C.F.R. § 622, Appendix A, Table 3 (listing Gulf of Mexico reef fish species).  The Gulf Counsel consists of members from the States of Texas, Louisiana, Mississippi, and Florida, with seventeen (17) voting members, eleven (11) of whom are appointed by the Secretary of Commerce and at least one member appointed from each of the Gulf States.  The Gulf Council is charged with overseeing the fisheries in the Gulf of Mexico by preparing fishery management plans (FMP) for the various reef fish in the Gulf of Mexico.  The Gulf Council originally implemented an FMP for reef fish (the Reef Fish FMP) in 1981. (Ar. 1).  The Reef Fish FMP has been modified by more than twenty (20) amendments and eight (8) interim or emergency rules or regulatory adjustments over that time. (Ar. 11689-11695).

On November 16, 2004, National Marine Fishery Service (NMFS) announced that the Gulf Council was considering the establishment of an individual fishing quota (IFQ) to control participation or effort in the commercial grouper fishery of the Gulf of Mexico.  69 Fed. Reg. 67,106 (Nov. 16, 2004).  Under an IFQ program each participant is allocated a fixed percentage (i.e., an individual quota) of the total catch to harvest. 16 U.S.C. § 1802 (23).  The Gulf Council stated that existing regulatory measures governing the commercial harvest of grouper and tilefish had resulted in the overcapitalization of the fishery. (Ar. 12935-12936).  In other words, the collective harvest capacity of fishery vessels and participants was in excess of that required to efficiently harvest the

commercial share of the total allowable catch (TAC).  More simply put, there were too many boats chasing too few fish. As a result of this overcapitalization, the commercial grouper regulations had become increasingly restrictive, thereby intensifying what is known as "derby" conditions under which fishermen race to harvest as many fish as possible before the quota runs out. (Ar. 12936). Thus, the Gulf Council undertook the amendment process to reduce overcapacity in the commercial grouper and tilefish fisheries to achieve and maintain the fisheries optimum yield (OY). (Ar. 12936).

In order to establish the criteria to determine who substantially fished the grouper and tilefish fishery, the NMFS announced that the Gulf Council was considering October 15, 2004, as a possible control date to begin its review of the catch histories of those individuals who  participated in the grouper and tilefish fishery. 69 Fed. Reg. 67,106 (Nov. 16, 2004).  The control date would establish a time frame to determine who substantially fished the reef fishery for grouper and tilefish between a start date and an end date.  The control date would then be used by the Gulf Council to establish a catch history over a period of several years to determine who substantially fished the reef fishery for grouper and tilefish.  The determination of who substantially fished the reef fishery for grouper and tilefish would be important because only those participants would be determined to have substantially fished the reef fishery, and therefore would later be allowed to vote on Amendment 29.

A notice was sent out regarding the issue which stated "[c]onsideration of a control date does not commit the Gulf Council or NMFS to any particular management regime or criteria for eligibility in the commercial grouper fishery.  69 Fed. Reg. 67,106 (Nov. 16, 2004).  The Gulf Council may or may not make use of this control date as part of the qualifying criteria for participation in any future IFQ or other management program for the Gulf of Mexico grouper fishery." (Ar. 67,107). The notice requested that any comments be submitted within thirty (30) days, however, none of the Plaintiffs

responded to the Notice. (Ar. 342).  The Gulf Council eventually settled on the dates between January 1, 1999, through December 31, 2004, as the control dates.

In 2006, Congress recognized that the tools available to the regional councils to manage stocks of fish were not generating the healthy and productive fisheries intended under the MSA:

> [A] full 10 years after passage of the [1996 Sustainable Fisheries Act (SFA) amendments], recent evaluations of stock status have revealed that overfishing is still occurring in a number of fisheries, even those fisheries under a rebuilding plan.  In many cases, this has resulted from failure of a plan to require adherence to scientifically-established mortality limits from one year to the next.

S. Rep. No. 109-229, at 21 (2006).

Congress thereafter added a new section to the MSA expressly authorizing regional councils to implement Limited Access Privilege Programs (LAPPs), including IFQ programs. Pub. L. No. 109-479, § 106, 120 Stat. 3575, 3586 (2007) (adding new § 303A to the MSA, codified at 16 U.S.C. § 1853a). A LAPP is a program that authorizes the permit holder to harvest a certain portion of the total catch allowed for a particular species. 16 U.S.C. § 1802(26).  LAPPs are a broad description for a number of different catch share programs under which the allowable catch of fish is distributed among the participants in the fishery, giving each one a specified stake in the annual harvest. One type of LAPP is an IFQ program, a method which was already being considered by the Gulf Council.

On September 12, 13, 17, and 18, 2007, the Gulf Council convened scoping hearings regarding Amendment 29 at locations throughout the Gulf States' coastal regions.  (Ar. 13191-13193).  Advance notice of the hearings was provided by the NMFS by publication in the Federal Register. 72 Fed. Reg. 48, 259 (August 23, 2007); (Ar. 5922).  Neither group of Plaintiffs made comments to the publication nor the proposed Amendment 29 at that time. (Ar. 5924-5956).

Although Coastal Conservation did make comments regarding another proposal related to Amendment 30.  (Ar. 5924-5956).

In promulgating Amendment 29, the Council considered three alternative approaches for managing effort in the commercial grouper and tilefish fisheries of the Gulf of Mexico: the status quo, the establishment of an IFQ program, and the establishment of an endorsement program. (Ar. 12946-12956).  The Gulf Council also briefly considered an auction plan, but determined that it would not prevent the issues being addressed by Amendment 29.  Under the status quo, the grouper and tilefish fisheries would continue to be managed using a combination of permit moratorium, quotas, season closures, minimum size limits, and trip limits. (Ar. 12947). This regulatory approach, however, led to the overcapitalization problem the Gulf Council was trying to resolve with Amendment 29.

Under an endorsement program, fishermen would receive permits that granted the right to harvest grouper and tilefish under certain limiting conditions. (Ar. 12953).  For example, permits could be issued with endorsements that limit the type of fishing gear being used (such as longline or vertical line gear) and could further limit the maximum allowable harvest per fishing trip. (Ar. 12953).  Upon detailed study of this alternative, the Council concluded that derby conditions could still persist and that permit endorsements would not significantly modify the impact on fish stocks resulting from the management approach that was already in existence. (Ar. 12953).

The Council also considered an IFQ program, which it determined to be the preferred approach. (Ar. 12947-12953). Under an IFQ plan, eligible participants would receive individual

quota shares of the total allowable catch. (Ar. 12947-12953).[2]  The Gulf Council concluded that

Derby conditions would be reduced because fishermen would not be compelled to race to fish given

that their allowable take would be pre-determined and would not be impacted by the takes of other

fishermen. (Ar. 12947-12953).   The Gulf Council reasoned that marginal and less efficient

operations would be expected to exit the fishery, and as overcapitalization began to be reduced,

adverse impacts on the physical environment would also be reduced because there would be fewer

participants and vessels in the fishery. (Ar. 12947-12953).  Moreover, the Gulf Council believed an

IFQ plan would reduce the rate of bycatch and "ghost fishing" (where fish are killed or abandoned

by lost gear) because crews, who were no longer racing to fish, would use less gear and fish with

greater efficiencies. (Ar. 12947-12953).

The Gulf Council considered five alternatives to determine who would be eligible to share

in the initial IFQ.  Under the MSA, the Gulf Council is required to determine which groups or

---

[2]      In 1996 the Magnuson-Stevens Act placed a moratorium on new IFQ programs until a comprehensive study could examine the "controversial IFQ-related issues such as initial allocation, transferability, and foreign ownership." S. Rept. No. 104-276 at 6.  The version that became law commissioned the National Academy of Sciences to do the study. See The Sustainable Fisheries Act, Pub. L. No. 104-297, sec. 108(e), § 303(f), 110 Stat. 3576 (1996).  Thus began the approximately six-year moratorium on new IFQ programs so that the National Academy of Sciences could study them.   The moratorium was extended in 2000 up to October 31, 2002. See Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, sec. 144(a)(1), § 303(d)(1)(A), 114 Stat. 2763A–238 (2000).  From 2002 to 2006, in order for a new IFQ program to be approved, it had to follow the recommendations from the National Academies of Science's study. See id. at § 144(a)(1), § 303(d)(5), 114 Stat. 2763A–238. The final 1999 National Academy of Sciences study made numerous recommendations that became the basis for the 2007 law. See S. Rept. No. 109-229 at 9 (2006) ("The Committee incorporated criteria that would allow Councils to balance many of the concerns fishermen, crew, communities, conservation groups, and other interests have had over the potential impacts of. . . rationalization programs. Many of these . . . were highlighted in the 1999 report of the National Research Council . . . .")

individuals would be considered substantial participants in the commercial grouper and tilefish fisheries.  The Gulf Council considered five alternatives to determine how to restrict initial share eligibility and four alternative apportionment methods that could be used to distribute the initial IFQ shares to the programs eligible participants.  (Ar. 12964,12967-12968).  In the end, the Gulf Council chose to restrict eligibility for initial IFQ share distribution to commercial reef fish permit holders and to distribute initial IFQ shares proportionately among eligible participants based on the average annual landings from logbooks associated with their current permit(s) during the time period 1999 through 2004, with an allowance for dropping 1 year. (Ar. 12964,12967-12968).

The Council considered seven alternatives for defining substantial participants who would be eligible to obtain quota shares via transfers after the initial allocations and ultimately selected the "no action" alterative. (Ar. 12961-12995). Under the no action alternative and the transfer alternative selected by the Council, IFQ shares can be transferred only to commercial reef fish permit holders during the first five years of the IFQ program, but may be transferred to all U.S. citizens and permanent resident aliens thereafter. (Ar. 12961-12995).  In other words, after the first five years, all U.S. citizens and permanent resident aliens are eligible for IFQ share or allocation transfer, although a commercial reef fish permit would still be needed to fish for grouper and tilefish. (Ar. 12961,12995). Thus, there would be no limitation in terms of the number of individuals eligible for the eventual transfer of IFQ shares or annual allocation. (Ar. 12961,12995).

To prevent an individual or entity from holding an excess amount of shares, the Gulf Council considered three alternatives and several sub-alternatives. (Ar. 12998-12999). The Gulf Council eventually decided to prevent an individual person from owning "more IFQ shares than the maximum percentage issued to the recipient of the largest shares at the time of the initial

-8-

apportionment of IFQ shares" and to create separate caps for each type of IFQ share and establish a cap on the total percentage of grouper/tilefish owned by any one person. (Ar. 12998-12999).

The Gulf Council put together an advisory panel (AP), which discussed creating an IFQ for grouper and tilefish in 2006. (Ar. 688). On January 12, 2007, the same day that the new version of MSA became law, the AP had already fleshed-out an outline of recommendations (Ar. 5003-5029), which was presented to the Gulf Council's Reef Fish Management Committee ("Reef Fish Committee") in March 2007. (Ar. 5434-5469,6724-6752).

In March 2007, the AP recommended a threshold for participation that required fishermen to have caught an average of 4,000 pounds of grouper and tilefish per year between 1999 and 2004 in order to be eligible to vote in the referendum on Amendment 29. (Ar. 5452). In April 2008, the AP modified its recommendation to a threshold of 1,000 pounds, on a weighted basis. (Ar 9160, 8658). Lowering the threshold meant that more people would be able to vote, but the weighted voting gave more votes to those who fished more. (Ar. 8658.) On June 3, 2008, the Reef Fish Committee recommended that the Gulf Council adopt a 4,000-pound unweighted catch threshold. (Ar. 8695-8697). Two days later, on June 5, 2008, the full Gulf Council approved a significantly higher, 8,000-pound-unweighted catch threshold over the qualifying period. (Ar. 8860-8864). This criteria for participation in the referendum excluded approximately seventy percent (70%) of all reef-fish permit holders from participating in the vote on Amendment 29. (Ar. 12167). In July 2008, the Gulf Council issued a public hearing draft of the Amendment 29 Environmental Impact Statement (EIS). (Ar. 11067). On July 21-31, 2008, the Gulf Council convened public hearings on Amendment 29 at ten (10) locations along the Gulf Coast. (Ar. 13190-13191). As with the scoping hearings, the Council again provided public notice concerning the meetings by publication in the

Federal Register. 73 Fed. Reg. 36,843 (June 30, 2008). (Ar. 9527). Based on the record in this case, it does not appear that any of the Plaintiffs in these consolidated cases provided comments during the public hearings. (Ar. 9865-9960).

On August 18, 2008, the Council sent a letter to NMFS requesting a referendum seeking approval for the proposed IFQ program for the commercial grouper and tilefish fisheries. (Ar. 12157). Attached to the letter, the Council provided a detailed document describing the range of alternatives considered and its rationale for choosing the preferred eligibility requirements. (Ar. 12159-12170). The Council considered four alternative referendum eligibility requirements: no action and restricting participation to reef fish permit holders who have combined average annual grouper and tilefish landings during the qualifying years of at least 1,000, 4,000 or 8,000 pounds per permit. (Ar. 12170-12173). The Council also considered whether to have votes weighted by the permit's grouper and tilefish catch history. (Ar. 12170-12173). The Gulf Council selected the 8,000 pound restriction criteria without the weighted catch history.

In selecting the 8,000 pound alternative, the Council explained that the individuals eligible to participate would account for thirty-one percent (31%) of the reef fish permits but approximately ninety percent (90%) of the grouper and tilefish total annual harvest. (Ar. 12157). The Gulf Council submitted a letter requesting a referendum in August 2008. (Ar.12157). A final rule approving the amendment procedures was finalized on December 1, 2008. (Ar. 12267). Using the criteria submitted by the Gulf Council, NMFS mailed 301 referendum ballots, 273 of which were returned. Of the 273 votes cast, 220 ballots, eighty one percent (81%), supported the IFQ program and fifty (50) or approximately, eighteen percent (18%), opposed the IFQ program. Three returned ballots were declared invalid. (Ar. 12353). The Amendment passed by January 6, 2009. (Ar. 12289).

Amendment 29 was approved on July 2, 2009, issuing a Record of Decision on the EIS. (Ar.

12780).  The final version of Amendment 29 was published in the Federal Register at 50 C.F.R. §

633 et seq., 74 Fed. Reg. 44732-44750 on August 31, 2009.  The Plaintiff Coastal Conservation

Association filed its Complaint (Doc. # 1) seeking declaratory and injunctive relief against the

Federal Defendants on September 28, 2009.  The Plaintiff Brian E. Lewis filed his Complaint (Doc.

# 1) seeking declaratory and injunctive relief against the Federal Defendants on September 29, 2009.

Lewis was subsequently joined by the Plaintiff Troy Fussell and they filed an Amended Complaint

(Doc. # 8) on December 17, 2009.  The cases were consolidated (Doc. # 22) by the District Court

on March 4, 2010.

## STATUTORY FRAMEWORK

### (1) The Magnuson-Stevens Act

In 1976 Congress found, *inter alia,* that fish off the coasts of the United States were a

valuable and renewable natural resource, but that certain stocks of fish had declined or could decline

to the point where their survival was threatened. 16 U.S.C. § 1801(a)(1) and (2). Congress also found

that commercial and recreational fishing constituted a major source of employment which

contributed significantly to the national economy, and that fishery resources were finite but

renewable. 16 U.S.C. § 1801(a)(3), (5). Further, Congress found that a national program for the

conservation and management of fishery resources was necessary to prevent overfishing, to rebuild

overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats,

and to realize the full potential of the country's fishery resources. 16 U.S.C. § 1801(a)(6).  Based on

-11-

these findings, Congress enacted the Magnuson-Stevens Act (MSA).[3] The purposes of the MSA included to "conserve and manage the fishery resources found off the coasts of the United States," 16 U.S.C. § 1801(b)(1); to promote domestic commercial and recreational fishing under sound conservation and management principles, 16 U.S.C. § 1801(b)(3); to provide for the preparation and implementation of fishery management plans, in accordance with national standards, which would achieve and maintain, on a continuing basis, the optimum yield for each fishery, 16 U.S.C. § 1801(b)(4); and to establish Regional Fishery Management Councils to be stewards of fishery resources through the preparation, monitoring, and revision of fishery management plans (FMP), 16 U.S.C. § 1801(b)(5). The MSA as amended created eight (8) Regional Fishery Management Councils. 16 U.S.C. § 1852(a). The Councils develop fishery management plans and plan amendments for each fishery requiring conservation and management; conduct public hearings concerning the development of fishery management plans and amendments and the administration and implementation of the MSA; submit proposed plans and amendments to the Secretary, 16 U.S.C. § 1852(h); and submit proposed regulations to the Secretary. 16 U.S.C. § 1853(c).

### (a) The Gulf of Mexico Fishery Management Council

The relevant Council in this case is the Gulf of Mexico Fishery Management Council (the Gulf Council). The Gulf Council is responsible for preparing the Fisheries Management Plan (FMP) for reef fish in the Gulf of Mexico. The Gulf Council manages fishery resources off the coasts of Texas, Louisiana, Mississippi, Alabama and Florida. 16 U.S.C. § 1852(a)(1)(E). See Delta

---

[3] In 1996, the Magnuson-Stevens Act was amended by the Sustainable Fisheries Act, which added new requirements to the Act to accelerate the rebuilding of overfished species. Natural Res. Def. Council, Inc. v. Nat'l Marine Fisheries Serv., 421 F.3d 872, 875 (9th Cir.2005).

<u>Commercial Fisheries Ass'n v. Gulf of Mexico Fishery Mgmt. Council</u>, 364 F.3d 269, 271 (5th Cir. 2004) (providing a further description of the Gulf Council). The Gulf Council's jurisdiction to manage fishery resources in the Gulf of Mexico extends from the outer limits of the state territorial waters (about nine (9) miles) to 200 nautical miles seaward.  <u>Coastal Conservation Ass'n v. Gutierrez</u>, WL 2850325 *1-2 (M.D.Fla. October 31, 2005) (citing <u>Southeastern Fisheries Ass'n, Inc. v. Chiles</u>, 979 F.2d 1504, 1507 (11th Cir.1992).

(<u><i>b</i>) <i>Fishery Management Plan</i></u>

The MSA requires the Gulf Council to prepare an FMP  which would achieve and maintain, on a continuing basis, the optimum yield (OY) for each fishery.   Any FMP must comply with the national standards listed in the MSA.  The MSA reads in pertinent part:

> Any fishery management plan prepared, and any regulation promulgated to implement any such plan, pursuant to this subchapter shall be consistent with the following national standards for fishery conservation and management:
>
> (1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.
>
> (2) Conservation and management measures shall be based upon the best scientific information available.
>
> (3) To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.
>
> (4) Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive

-13-

share of such privileges.

(5) Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose.

(6) Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

(7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

(8) Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

(9) Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.

(10) Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

16 U.S.C. § 1851(a).  The Secretary of Commerce reviews each plan or amendment, either approves, disapproves, or partially approves it after complying with certain procedural requirements. 16 U.S.C. § 1854(a).  If a plan or amendment is approved, the Secretary promulgates regulations to implement the FMP or amendment, which will then have the force of law. 16 U.S.C. §§ 1854(a) and 1855(d).

### (c) Limited Access Privilege Programs

After the date of the enactment of the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006 (January 12, 2007), a Council may submit, and the Secretary may approve, a limited access privilege program. 16 U.S.C. § 1853a. A "limited access privilege" is defined as a Federal permit that provides a person the exclusive privilege to harvest a specific portion of a fishery's total allowable catch and includes an IFQ program like the one implemented in Amendment 29. 16 U.S.C. § 1802(26). The MSA sets forth numerous requirements for the development of such a program. 16 U.S.C. § 1853a. Relevant to the issues before the Court, the IFQ program was required to contribute to reducing overcapacity and promote safe fishing, fishery conservation and management, and social and economic benefits. 16 U.S.C. § 1853a(c)(1)(B), (C).

### (2) The National Environmental Policy Act

The purpose and intent of the National Environmental Policy Act (NEPA) is to focus the attention of the federal government and the public on a proposed action so that the consequences of the action can be studied before the action is implemented and potential negative environmental impacts can be avoided. Ocean Conservancy v. Evans, 2003 WL 23358201 *2 (M.D. Fla. December 17, 2003) (citing 42 U.S.C. § 4321 and 40 C.F.R. § 1501.1(c)); Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 371, 109 S. Ct. 1851, 104 L. Ed. 2d 377 (1989).  NEPA mandates the procedures by which agencies must consider the environmental impacts of their actions, but does not dictate the substantive results. Ocean Conservancy, 2003 WL 23358201 at *2 (citing Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350, 109 S. Ct. 1835, 104 L. Ed. 2d 351 (1989)).

The Eleventh Circuit has made it clear that a court's "only role [under NEPA] is to ensure that the agency has taken a hard look at the environmental consequences of the proposed action." Fund for Animals, Inc. v. Rice, 85 F. 3d 535, 546 (11th Cir. 1996).

To that end, NEPA requires the preparation of an environmental impact statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." Ocean Conservancy, 2003 WL 23358201 at *2 (citing 42 U.S.C. § 4332(2)(C)).  The agency creating the EIS must examine: (1) the impacts of the proposed action; (2) any adverse environmental effects of the action that cannot be avoided; (3) alternatives to the proposed action; (4) the relationship between local, short-term uses of the environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitment of resources which would be involved. 42 U.S.C. § 4332.  However, "NEPA does not require that all impacts be discussed in exhaustive detail but only that the EIS furnish such information as appears to be reasonably necessary under the circumstances for the evaluation of the project." Britt v. U.S. Army Corps of Eng'rs, 769 F.2d 84, 91 (2d Cir. 1985); Florida Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs, 374 F. Supp. 2d 1116, 1150-51 (S.D. Fla. 2005) (holding that an EIS detailed statement need only include reasonable non-speculative alternatives); See 40 C.F.R. § 1508.25(a)(2) (stating that an EIS analysis of cumulative actions is required to cover only proposed actions rather than actions that are only a theoretical possibility).

If there is a question whether a proposed action satisfies these criteria, an environmental assessment (EA) may be prepared. An EA is a brief and concise document containing sufficient evidence and analysis for the agency to determine whether to prepare a more extensive EIS or a finding of no significant impact.  Florida Keys Citizens Coal., Inc., 374 F. Supp. 2d  at 1123 -24

(citing 40 C.F.R. 1508.9(a)(1); <u>River Road. Alliance, Inc. v. Corps of Eng'rs of United States Army</u>, 764 F.2d 445, 449 (7th Cir.1985) ("The purpose of an [EA] is to determine whether there is enough likelihood of significant environmental consequences to justify the time and expense of preparing an [EIS].")). An EA must include only "brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). A third option is available for certain federal actions that have been determined, because of their very nature and past experience, not to have, individually or cumulatively, a significant effect on the human environment. 40 C.F.R. §§ 1501.4(a), 1508.4. Such actions are considered "categorically excluded" from the requirement of either an EA or EIS review.

<u>(3) The Regulatory Flexibility Act</u>

The Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601-612, as amended by Title II of Public Law 104-121, the Small Business Regulatory Enforcement Fairness Act ("SBREFA"), requires federal agencies to consider potential impacts of their rules on small entities. Under the RFA, agencies must conduct a regulatory flexibility analysis to analyze possible effects of a proposed rule on small businesses, unless the agency certifies that the "rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). Where a rule is anticipated to have significant economic impacts on a substantial number of small entities, the RFA's provision governing preparation of a final regulatory flexibility analysis, 5 U.S.C. § 604, requires that the agency provide a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy and legal reasons for selecting the alternative

-17-

adopted in the final rule and why each one of the other significant alternatives to the rule considered

by the agency which affect the impact on small entities was rejected. 5 U.S.C. § 604(5). In SBREFA,

Congress limited judicial review of alleged violations of the RFA to claims regarding "agency

compliance with the requirements of sections 601, 604, 605(b), 608(b), and 610. . . ." 5 U.S.C. §

611(a)(1); see also 5 U.S.C. § 611(c) ("Compliance or noncompliance by an agency with the

provisions of this chapter shall be subject to judicial review only in accordance with this section.").

### (4) The Administrative Procedures Act

The Administrative Procedures Act (APA) authorizes a court to "set aside agency actions,

findings, and conclusions found to be . . arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law." 5 U.S.C. § 706(2). Plaintiffs bring this action under this provision of

the APA. The APA, by its terms, provides a right to judicial review of all final agency action for

which there is no other adequate remedy in the court, § 704, and applies universally except to the

extent that - (1) statutes preclude judicial review; or (2) agency action is committed to agency

discretion by law, § 701(a). Bennett v. Spears, 520 U.S. 154, 175, 117 S. Ct. 1154, 137 L. Ed. 2d

281 (1997).

### STANDARD OF REVIEW

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine

issue as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed.

R. Civ. P. 56(c). An issue is genuine if there is sufficient evidence such that a reasonable jury could

return a verdict for either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 U.S.

2505, 91 L. Ed. 2d 202 (1986). Similarly, an issue is material if it may affect the outcome of the

suit under governing law. Id. The moving party bears the burden of showing the absence of any

genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In deciding whether the moving party has met this initial burden, the Court must review the record and all reasonable inferences drawn from the record in the light most favorable to the non-moving party. Whatley v. CNA Ins. Co., 189 F.3d 1310, 1313 (11th Cir. 1999). Once the Court determines that the moving party has met its burden, the burden shifts and the non-moving party must present specific facts showing that there is a genuine issue for trial that precludes summary judgment. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "The evidence presented cannot consist of conclusory allegations, legal conclusions or evidence which would be inadmissible at trial." Demyan v. Sun Life Assurance Co. of Canada, 148 F. Supp. 2d 1316, 1320 (S.D. Fla. 2001) (citing Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991)). Failure to show sufficient evidence of any essential element is fatal to the claim and the Court should grant the summary judgment. Celotex, 477 U.S. at 322-23. Conversely, if reasonable minds could find a genuine issue of material fact then summary judgment should be denied. Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1532 (11th Cir. 1992).

In the instant case, the facts underlying the Plaintiffs' claims in this action are documented in the Administrative Record before this Court. Therefore, the relevant legal inquiry centers on whether the disputed actions are supported by the Administrative Record in this case. The standard of review for claims under the MSA, NEPA, and the APA itself is supplied by the APA, 5 U.S.C. § 706(2). Ocean Conservancy v. Evans, 260 F. Supp. 2d 1162, 1168 -69 (M.D. Fla. 2003). The Court should hold unlawful and set aside any of the Federal Defendants' challenged actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C.

§ 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), or "without observance of procedure required by law," 5 U.S.C. § 706(2)(D).

"Judicial review of an informal administrative agency decision focuses first upon whether the administrator acted within the scope of his or her authority, and, second, upon whether the administrator's decision was arbitrary and capricious." Ocean Conservancy, 260 F. Supp. at 1168 -69 (citing City of Pompano Beach v. F.A.A., 774 F.2d 1529, 1539 n. 10 (11th Cir.1985)(citing Citizens to Preserve Overton Park v. Volpe , 401 U.S. at 416, 91 S. Ct. 814, 28 L. Ed. 136 (1971) (overturned on other grounds))).

"In an APA case, the fact finding capacity of the district court is typically unnecessary. The Court  is to decide, on the basis of the record the agency provides, whether the actions pass muster under the appropriate APA standard of review." Ocean Conservancy, 260 F. Supp. at 1168-69 (citing Loggerhead Turtle v. County Council of Volusia County , 120 F. Supp. 2d 1005, 1013 (M.D. Fla. 2000)). "Since the Court determines the issues based on the agency's administrative record, a trial is generally unnecessary and summary judgment is often appropriate." Ocean Conservancy, 260 F. Supp. at 1168-69.

In sum, this Court may not substitute its judgment for the Federal Defendants' expertise, nor may it substitute an objecting party's preferences for that of the agency.  Id. (citing Overton Park, 401 U.S. at 416).  Accordingly, the Federal Defendants' decisions are to be upheld unless the Plaintiffs can demonstrate, on the Administrative Record, that the challenged decisions were arbitrary and capricious or not otherwise in accordance with law. Ocean Conservancy, 260 F. Supp. at 1168-69.

## DISCUSSION

The Plaintiffs, Lewis and Fussell, contend that Amendment 29 was issued in violation of the APA's rule making procedures because the control dates used by the Gulf Council were not properly noticed; the United States Constitution's Fifth Amendment Due Process and Just Compensation clauses; the MSA; the Regulatory Flexibility Act (RFA); and Presidential Order No. 12866, which directs the Federal Defendants to comply with the RFA.  The Plaintiff, Coastal Conservation Association (Coastal Conservation) argues that Amendment 29 was issued in violation of the MSA because the Federal Defendants failed to consider the effect of Amendment 29 on the entire fishery; failed to consider its effect on the recreational sector; failed to comply with National Standards 1, 2, 8, and 9 of the MSA; and finally Amendment 29 violated National Environmental Policy Act (NEPA).   The *Amicus Curiae* Fresh Water Watch's memorandum states that Amendment 29 violates the MSA because it excluded certain fishermen from voting in the referendum that approved the Amendment; Amendment 29 failed to minimize bycatch or mortality from bycatch as well failed to consider the Amendments socio-economic impacts; and finally Amendment 29 violated NEPA.

The Federal Defendants filed a combined memorandum in support of their Cross-Motion for Summary Judgment.   Initially, the Federal Defendants argued the Plaintiff, Coastal Conservation, lacks the standing to even bring its Complaint.  In their memorandum, the Federal Defendants put forth the argument that their actions in promulgating the Final Rule of the NMFS implementing Amendment 29 to the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico (Reef Fish FMP), 74 Fed. Reg. 44,732 (Aug. 31, 2009), were consistent with the substantive and procedural requirements of the MSA, NEPA, 42 U.S.C. § 4321 et seq, the RFA,

5 U.S.C. §§ 601-612, as amended by Title II of Public Law 104-121, the Small Business Regulatory

Enforcement Fairness Act ("SBREFA"), and the APA, 5 U.S.C. § 701 *et seq*., and supported by the

Administrative Records, and therefore their actions are entitled to deference. The Federal

Defendants further argued that the Plaintiffs failed to demonstrate that their actions were arbitrary

and capricious or otherwise unlawful, pursuant to 16 U.S.C. § 1855(f)(1).

        Like the Federal Defendants, the Intervenor Defendants, The Gulf of Mexico Reef Fish

Shareholders' Alliance and the Environmental Defense Fund (Intervenor Defendants) argue that the

Plaintiff Coastal Conservation Association has not set forth any evidence that it suffered an injury

in fact, and therefore, it lacks standing to bring its Complaint.  The Intervenor Defendants state the

Plaintiffs' Motions merely advance generalized policy grievances with the management action at

issue – Amendment 29 to the Fishery Management Plan for Reef Fish Resources in the Gulf of

Mexico Exclusive Economic Zone – but fail to demonstrate any violation of law in its development

or implementation. The Intervenor Defendants assert the Plaintiffs have failed to demonstrate that

Amendment 29 violates the MSA, the APA,  NEPA, RFA  or the U.S. Constitution, thus, the

Plaintiffs' Motions for Summary Judgment must be denied.  For the same reasons, the Intervenor

Defendants state the administrative record demonstrates that the Federal Defendants development

and implementation of Amendment 29 fully complied with all legal requirements, and as a result

this Court should grant the Intervenor-Defendants and the Federal Defendants cross motions for

summary judgment and dismiss Plaintiffs claims in their entirety.

### (1) Whether Coastal Conservation Association has Standing to Appear

        Because the issue of standing is a threshold matter, the Court must first address the

Defendants' challenge to Coastal Conservation's right to pursue the claims articulated in its

Complaint.  The Federal Defendants claim that Coastal Conservation lacks standing because it failed to articulate how Amendment 29 posed any threat to the recreational fisherman that it claims to represent when Amendment 29 only applies to commercial fisherman.  The Intervenor Defendant states that Coastal Conservation has failed to provide any evidence that has suffered an injury in fact sufficient to give it standing under Article III of the United States Constitution.

In accordance with the "case or controversy" requirement of Article III, a plaintiff must have standing to bring a claim in federal court. <u>Sierra Club v. Johnson</u>, 436 F.3d 1269, 1276 (11th Cir. 2006) (citing U.S. Const. Art. III, § 2, cl. 1); <u>see also</u> <u>Allen v. Wright</u>, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L. Ed. 2d 556 (1984) ("[T]he 'case or controversy' requirement defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded.").  The Federal and Intervenor Defendants contend that Coastal Conservation lacks standing to challenge Amendment 29 because the Amendment pertains only to commercial fisherman and not the recreational fisherman Coastal Conservation represents.

Coastal Conservation bases its standing on the MSA's requirement that the agency assess and analyze the impact of the Amendment on the entire fishery, which Coastal argues includes the recreational sector.  As such, Coastal reasons that the failure of the Federal Defendants to analyze the effects of Amendment 29 on the recreational sector is itself an injury in fact sufficient to give it standing.

The "irreducible constitutional minimum" of standing requires: (1) that the plaintiff have suffered an injury in fact, an invasion of a judicially cognizable interest which is concrete and particularized, and actual or imminent; (2) that there be a causal connection between the injury and the conduct complained of, *i.e.* the injury must be fairly traceable to the challenged action of the

Defendant; and (3) that it be likely that the injury will be redressed by a favorable decision. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).  An association such as Coastal Conservation has standing to bring suit on behalf of its  members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." <u>Johnson</u>, 436 F.3d at 1276 (citing <u>Hunt v. Wash. State Apple Advertising Comm'n</u>, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441, 53 L. Ed. 2d 383 (1977)).

"[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." <u>Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.</u>, 528 U.S. 167, 183 (2000) (citing <u>Sierra Club v. Morton</u>, 405 U.S. 727, 735 (1972)).  Similarly, courts have found standing for environmental and other representative organizations in cases where an agency failed to consider the impact of its decision upon the organization's area of interest. <u>Partnership for a Sustainable Future, Inc. v. U.S. Fish and Wildlife Serv.</u>, 2002 WL 33883548 *3 (M.D. Fla. July 12, 2002) (noting the Ninth Circuit in <u>Kern v. United States Bureau of Land Mgmt.</u>, 284 F.3d 1062, 1071 (9th Cir. 2002), came to the same conclusion when an environmental organization and individuals brought action against the Bureau of Land Management under NEPA alleging failure to adequately consider the impact of root fungus on a specific variety of cedar).  The Ninth Circuit noted that the rights conferred by NEPA are procedural rather than substantive, and any injury under NEPA occurs when the allegedly inadequate procedure is followed.

In this instance, Coastal Conservation is alleging the Federal Defendants procedurally failed to follow the requirements of the APA and MSA when they did not consider the impact of Amendment 29 on the recreational fisherman using the Gulf reef fisheries and that Amendment 29 violated NEPA. The rights conferred under the NEPA are procedural rather than substantive, and any injury under the NEPA occurs when the allegedly inadequate procedure is followed. Partnership for a Sustainable Future, Inc., 2002 WL 33883548 at *3) (citing Kern, 284 F.3d at 1071).

Coastal Conservation states that it represents the recreational fishermen who use the Gulf Reef Fishery. Coastal Conservation further alleges that the value of the fishery will be diminished under Amendment 29 for the recreational fisherman who participate in the Gulf reef fishery due to the Federal Defendants procedural violation of both the MSA and NEPA. As such, Coastal Conservation has alleged an injury in fact. Friends of the Earth, Inc., 528 U.S. at 183. Thus, Coastal Conservation has standing to bring the instant lawsuit.

### (2) Whether Control Date Notices Violated the APA

Under the APA, rule making "shall be published in the Federal Register, [or by] actual notice." 5 U.S.C. § 553(b). The notice shall include "time, place, and nature of public ruling" and "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(1)-(3). Further, the MSA also sets out statutory guidelines related to the conduct of business. Congress in 16 U.S.C. § 1852(h)(3), directed the fisheries councils including the Gulf Council to "conduct public hearings, at appropriate times and in appropriate locations in the geographical area concerned, so as to allow all interested persons an opportunity to be heard in the development of fishery management plans and amendments. Congress further stated, that "[t]imely public notice of each regular meeting and each emergency meeting, including the time,

place, and agenda of the meeting, shall be provided by any means that will result in wide publicity in the major fishing ports of the region." 16 U.S.C. § 1852(i)(2)(C).   The Gulf Council is directed to provide "[p]ublic notice of regular meetings of the Council . . . including the agenda, must be published in the Federal Register on a timely basis, and appropriate news media notice must be given." 50 C.F.R § 600.135(a).

The Plaintiffs Lewis and Fussell contend that the Gulf Council violated the APA because it did not properly notice the public that it would consider control dates at a meeting scheduled for October 14, 2004.  On September 20, 2004, the notice regarding the October 2004 Gulf Council meeting was published to the public. (Ar. 687-687).  The agenda for the council meeting failed to provide notice of a control date discussion or motion. (Ar. 781-82). Even the agenda of the reef fish management committee failed to provide notice. (Ar. 689). These same violations of notice also occurred in the reef fishery notice issued during September 2004. (Ar. 720,886).  The Plaintiffs Lewis and Fussell state that both of these notices for rulemakings, one for  setting control dates, and the other for grouper and tilefish, violated the notice requirements under the APA and the MSA.  At that meeting, the Gulf Council announced that it was considering setting the potential control dates for total harvest and eligibility determinations as October 15, 2004.

The Government Defendants respond on November 16, 2004, the NMFS published a notice in the Federal Register that the Service was considering the establishment of an IFQ  program in the commercial grouper fishery.  In particular, the NMFS stated that the Gulf Council was considering October 15, 2004, as a possible control date. 69 Fed. Reg. 67,106 (Nov. 16, 2004).  The notice continues that "consideration of a control date does not commit the [Gulf Council] or NMFS to any particular management regime or criteria for eligibility in the commercial grouper fishery." Id.  "The

-26-

[Gulf Council] may or may not make use of this control date as part of the qualifying criteria for participation in any future IFQ or other management program for the Gulf of Mexico grouper fishery." Id. at 67,107.  As such, the Government Defendant's argue there was sufficient notice provided to the Plaintiffs Lewis and Fussell.

Initially, the Court notes that the Gulf Council is not an agency within the meaning of the APA and therefore, the adoption of a particular policy used in setting commercial catch quotas, such as a control date, cannot violate the APA. Gen. Category Scallop Fishermen v. Sec'y of Commerce, 720 F. Supp. 2d 564, 577 (D. N.J. 2010) (holding that a fishery management council is not an agency under the APA).  Thus, the Gulf Council's proposal of a control date on October 14, 2004, was not a violation of the APA nor of the Plaintiff's due process rights. Id. The NMFS issued a notice in the Federal Register that stated the NMFS was considering the October date as a control date. 69 Fed. Reg. 67,106 (Nov. 16, 2004).  The NMFS's publication of the proposed control date in the Federal Register of November 16, 2004, gave the Plaintiffs sufficient notice that the Gulf Council and/or NMFS was considering October 15, 2004, in making IFQ determinations.  Furthermore, the notice stated that "[c]onsideration of a control date does not commit the Gulf Council or NMFS to any particular management regime or criteria for eligibility in the commercial grouper fishery. The Gulf Council may or may not make use of this control date as part of the qualifying criteria for participation in any future IFQ or other management program for the Gulf of Mexico grouper fishery." 69 Fed. Reg. 67,107.  Although the notice requested that any comments be submitted within thirty (30) days, neither Lewis or Fussell made any comments.

Notice was again listed in the Federal Register in August of 2007 for scoping hearings held by the Gulf Council concerning  Amendment 29 throughout the Gulf coast areas on September 12,

13, 17, and 18, 2007. Fed. Reg. 48,259 (August 23, 2007). The Plaintiffs had numerous additional opportunities to comment during the meetings and public hearings held before the referendum proposed rule was published in September 2008, which is almost four years after the control date was first published in the Federal Register. (Ar.  342).

The fact that the hearings were held and notice given in the Federal Register is sufficient to satisfy the APA, because notification in the Federal Register is sufficient to comport with any due process or procedural claims. <u>Scallop Fishermen</u>, 720 F. Supp. 2d at 577 (citing <u>California ex rel. Lockyer v. F.E.R.C.</u>, 329 F. 3d 700, 707 (9th Cir. 2003)); <u>See</u> 44 U.S.C. § 1507 (stating that filing a notice in the federal register gives constructive notice to all affected by the program). The Plaintiffs had sufficient time, four years and numerous hearings to object to the control dates yet the record shows that neither  Lewis nor Fussell made any comments for or against the control dates during any of the scoping hearings held in September of 2007 or after the November 26, 2004, notice. Moreover, the Plaintiff Coastal Conservation failed to provide any comments during the September 2007 scoping hearings, although Coastal Conservation did provide comments concerning the Reef Fish Amendment 30.  Upon review of the record before the Court, it is clear that the Defendants followed the procedure required by the APA and the MSA in developing and issuing control dates used in the development of Amendment 29.

### (3) Whether Amendment 29 Violated the U.S. Constitution

The Plaintiffs Lewis and Fussell argue that their due process rights were violated by the loss of their fishing permits.  Procedural due process claims are cognizable only upon a showing that a recognized liberty or property interest is at stake. <u>Board of Regents of State Colleges v. Roth</u>, 408 U.S. 564, 569, 92 S .Ct. 2701, 2709, 33 L. Ed. 2d 548 (1972). The essence of procedural due process

is notice and an opportunity to be heard. <u>Zisser v. Florida Bar</u>, 747 F. Supp. 2d 1303, 1316-17 (M.D. Fla. 2010) (citing <u>Mathews v. Eldridge</u>, 424 U.S. 319, 348, 96 S. Ct. 893, 909, 47 L. Ed. 2d 18 (1976)). The basic purport of due process is that, before a deprivation of either property or liberty takes place at the hands of the state, the affected person must be forewarned and afforded an opportunity to be heard "at a meaningful time and in a meaningful manner." <u>Zisser</u>, 747 F. Supp. 2d at 1317 (citing <u>Armstrong v. Manzo</u>, 380 U.S. 545, 552, 85 S. Ct. 1187, 1191, 14 L. Ed. 2d 62 (1965)). As the rubric's name implies, "procedural due process" is simply "a guarantee of fair procedure." <u>Zisser</u>, 747 F. Supp. 2d at 1317 (citing <u>Zinermon v. Burch</u>, 494 U.S. 113, 110 S. Ct. 975, 983, 108 L. Ed. 2d 100 (1990)).

The Plaintiffs Lewis and Fussell argue from <u>Bell v. Burson</u>, 402 U.S. 535, 539, 91 S. Ct. 1586, 29 L. Ed. 2d 90 (1971), that licenses may not be taken away without procedural due process. In <u>Bell</u>, the Supreme Court stated that once a drivers license had been issued it could not be taken away without the procedural due process required by the Fourteenth Amendment. <u>Id.</u> Although not specifically stated in exact terms, the Plaintiffs appear to argue that there is a both Fifth Amendment taking violation and a Fourteenth Amendment due process violation.

### <u>(a) Due Process</u>

"A § 1983 action alleging a procedural due process clause violation requires proof of three elements: a deprivation of a constitutionally-protected liberty or property interest; state action; and constitutionally inadequate process." <u>Zisser</u>, 747 F. Supp. 2d at 1317 (citing <u>Cryder v. Oxendine</u>, 24 F.3d 175, 177 (11th Cir.1994)); <u>Grayden v Rhodes</u>, 242 F. 3d 1225, 1232 (11th Cir. 2003)(describing the elements as: "(1) a constitutionally protected interest in life, liberty, or property; (2) governmental deprivation of that interest; and (3) the constitutional inadequacy of procedures

-29-

accompanying the deprivation."). Failure to establish any one of these elements is fatal to a plaintiff's procedural due process claim under § 1983. <u>Zisser</u>, 747 F. Supp. 2d at 1317.

In Counts I and II, the Plaintiffs, Lewis and Fussell, argue that the NMFS and the Gulf Council's selection process used to determine who could vote on Amendment 29 eliminated seventy percent (70%) of the individuals that hold permits to fish the Gulf Reef Fishery.  Lewis and Fussell contend that the selection process adversely affected two separate class of fishermen.  The first class, represented by the Plaintiff Lewis, were fishermen that were not allowed to vote in the referendum on Amendment 29 and subsequently lost their fishing permits.  The second class, represented by the Plaintiff Fussell, were also prevented from voting in the referendum, yet retained the right to receive some quota in the grouper and tilefish harvest, but later lost their permits.

The Plaintiffs argue that the selection process used to determine who could vote and the corresponding referendum on Amendment 29 violated their due process rights because it limited the number of individuals that could vote and deprived them of their fishing permits without providing the proper notice of such action.  The Gulf Council used as control dates January 1, 1999, through December 31, 2004, to determine who could vote in the referendum on Amendment 29.  Lewis complains that he purchased his permit to fish in the Gulf waters in 2002, but did not begin fishing for Grouper and tilefish until 2005.  Lewis states the control dates used by the Gulf Council and the NMFS service excluded him from participating in the referendum on Amendment 29 and prevented him from sharing in the IFQ distribution.  Fussell was  not allowed to participate in the referendum on Amendment 29 but subsequently lost his reef fisheries permit

### *Liberty Interest*

The Plaintiffs Lewis and Fussell state that they lost their fishing license to fish in the Gulf due to the passage of Amendment 29 and therefore lost their right to work in the fishing industry. The Government argues the Plaintiffs Lewis and Fussell's liberty interests are not implicated because they remained free to pursue other employment including fishing for other species within the Gulf Reef Fisheries, subject to the other species permits' requirements. The Defendants respond that liberty interests are not generally implicated in employment context where an individual remains free to pursue other employment. Roth, 408 U.S. at 575.

In this instance the Plaintiffs could pursue other fishing permits in the Gulf Reef Fishery such as snapper and/or red fish. Amendment 29 also allows for the transfer of grouper and tilefish permits within the first five (5) years for individuals that possess reef fish permit and after five years to all citizens and legal aliens. (Ar. 12995-12998). Consequently, the Plaintiffs, Lewis and Fussell failed to establish that they have a protectable liberty interest in receiving an IFQ permit under Amendment 29. Roth, 408 U.S. at 575.

### *Property Interest*

Property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Id. at 577. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Id. "[A] legitimate claim of entitlement is created only when the statutes or

regulations in question establish a framework of factual conditions delimiting entitlements which are capable of being explored in a due process hearing." Zisser, 747 F. Supp. 2d at 1317 (citing Eidson v. Pierce, 745 F.2d 453, 459–60 (7th Cir.1984)).  Put another way, a person has a legitimate claim of entitlement to keep that which presently and securely belongs to that person. Where state law provides a benefit and creates a system governing revocation or renewal of that benefit, the recipients have a secure and durable property right, a legitimate claim of entitlement. Zisser, 747 F. Supp. 2d at 1317 (citing Reed v. Village of Shorewood, 704 F.2d 943, 948 (7th Cir.1983) ("[P]roperty is what is securely and durably yours under state . . . law as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain."). Accordingly, the salient issue is whether state law provides that Lewis and Fussell, and any other putative applicants, hold  a secure and durable interest in a fishing permit under Amendment 29.

While the Plaintiffs allege that there was a substantive constitutional violation, Congress granted the Secretary of Commerce the authority to manage resources within the Gulf Reef Fisheries EEZ, and therefore the expectation of participation in the federal fisheries does not arise to the level of a "legitimate claim of entitlement." Parravano v. Babbitt, 861 F. Supp. 914, 928 (N.D. Cal. 1994), aff'd 70 F. 3d 539 (9th Cir. 1995); See Vickers v. Egbert, 359 F. Supp. 2d 1358, 1362 (S.D. Fla. 2005) ("[f]ishing, whether commercial or recreational, is not a fundamental right and those engaged in these activities are not a suspect class."); Sherley v. NOAA, 8:04-cv-645 T-17MSS, (M.D. Fla. 2004) (finding the denial of plaintiff's claim for a permit to conduct a charter fishing business by the NMFS did not rise to denial of liberty or property interest and therefore no denial of due process). There is no substantive due process violation because there is no entitlement to a fishing permit under the U.S. Constitution.  Instead, a permit for fishing in the Gulf Reef Fisheries is derived from

the authority Congress delegated to the Secretary of Commerce and subject to the rules and requirements delineated by the Federal Regulations.  Therefore, the Plaintiffs Lewis and Fussell cannot claim a legitimate entitlement to a fishing permit.

Notwithstanding, some courts have found– for the purpose of determining if procedural due process has been violated– that an IFQ permit gives a protectable property interest in receiving an IFQ permit.  Foss v. National Marine Fisheries Service, 161 F. 3d 584, 588 (9th Cir. 1998).  This interest is different than that provided by the MSA itself.  Unlike the specific, mandatory regulations implementing the IFQ program, the language of the MSA does not confer any claim of entitlement or property rights.  Id.   As such, it may be concluded that Lewis and Fussell have a property right bestowed under the IFQ program solely for the purpose of procedural due process review and not as a substantive right.

### Constitutional Adequacy of the Procedures Used by the Government

It is undisputed that the NMFS, a government agency, established the IFQ program limiting access to fishing permits for grouper and tilefish in the Gulf Reef Fisheries.  The issue then is whether or not the Federal Defendants (NMFS, associated agencies, boards and councils) provided proper due process in depriving the Plaintiffs Lewis and Fussell, of their reef fish permits.  In short, were they provided adequate due process.

The Plaintiffs Lewis and Fussell argue they did not receive adequate notice of what the control dates would be used to establish the electorate and thereby the Federal Defendants deprived them of due process.  The NMFS control dates established that only individuals who substantially fished the reef fisheries from January 1, 1999, through December 31, 2004, could vote on

Amendment 29. The Plaintiff Lewis states that he was not allowed to vote and lost his license, without proper notice, because he did not fit into the criteria established by the NMFS .  Lewis obtained a Gulf Reef Fisheries permit in 2002, however, he did not use it until 2005.

As noted above, the essence of procedural due process is notice and an opportunity to be heard. Zisser, 747 F. Supp. 2d at 1316-17 (M.D. Fla. 2010); Foss, 161 F.3d at 590 (notice is a fundamental requirement of due process).  While the Plaintiffs allege that they did not receive adequate notice of the control dates used to define the electorate, the NMFS published the dates in the Federal Register in November of 2004.  Neither Lewis nor Fussell made any comments at that time that they opposed the proposed control dates, although there was a thirty (30) day period in which to respond to the notice in the Federal Register.[4]  Publication in the Federal Register is sufficient to comport with any due process or procedural claims.  Scallop Fishermen, 720 F. Supp. 2d at 577 (citing California ex rel. Lockyer v. F.E.R.C., 329 F. 3d 700, 707 (9th Cir. 2003)); See 44 U.S.C. § 1507 (stating that filing a notice in the federal register gives constructive notice to all affected by the program).  Moreover, the Gulf Council held meetings on several occasions allowing individuals to comment on the potential terms of Amendment 29.  Again, neither Lewis nor Fussell made any comments against the control dates proposed by the NMFS.  Given that the  Federal Defendant's filed notice in the Federal Register and held meetings through the Gulf states pertaining to Amendment 29 and the intended  control dates, there was no violation of procedural due process.  Thus, Lewis and Fussell's procedural due process claim fails in this instance.

---

[4]    The Plaintiff Brian Lewis submitted a comment regarding Amendment 29 via e-mail on April 20, 2009. (Ar. 401).

*(b) Fifth Amendment Regulatory Takings Clause*

The Plaintiffs Lewis and Fussell state they are seeking "financial compensation for economic damages" in connection with the alleged violations. (Doc. # 63 at 26).   The Court notes that under the Tucker Act the United States Court of Federal Claims has jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. 28 U.S.C. § 1491(a)(1).   District Courts have jurisdiction to hear takings claims up to only $10,000. 28 U.S.C.1346(a)(2).  The United States Court of Federal Claims has exclusive jurisdiction over non-tort claims for damages against the United States in excess of $10,000. 28 U.S.C. § 1491(a).   The Plaintiffs did not allege an amount of economic loss nor offer a figure of potential monetary loss. The Court could assume that the economic damage is well in excess of $10,000.00, but such an assumption would not be based upon any facts presented by the Plaintiffs.  It is questionable that this Court even has jurisdiction over the Plaintiff's Constitutional takings claims.   Nevertheless, for arguments sake, the Court will review the claim.

"The Fifth Amendment prohibits the taking of private property 'for public use, without just compensation'-a condition made applicable to the States by the Fourteenth Amendment." 126th Ave. Landfill, Inc. v. Pinellas County, Fla., 2009 WL 1544030 *1 n. 2 (M.D. Fla. June 3, 2009) (citing U.S. Const. Amend. V); Palazzolo v. Rhode Island, 533 U.S. 606, 617, 121 S. Ct. 2448, 150 L. Ed. 2d 592 (2001) (noting that the Fourteenth Amendment made the Takings Clause applicable to the States). There are two main categories of taking: a physical taking and a regulatory taking. A physical taking is the "paradigmatic taking" and occurs when a government directly appropriates or

physically invades private property. <u>Lingle v. Chevron U.S.A., Inc.</u>, 544 U.S. 528, 537, 125 S. Ct. 2074, 161 L. Ed. 2d 876 (2005).   A regulatory taking occurs when the government passes a regulation pursuant to its police power which has the effect of depriving a landowner of all economically beneficial use of its land. <u>126th Ave. Landfill, Inc.</u>, 2009 WL 1544030 at *1 n. 2 (citing <u>Lucas v. S.C. Coastal Council</u>, 505 U.S. 1003, 1015, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992); <u>Rymer v. Douglas County</u>, 764 F.2d 796, 800 (11th Cir.1985). At issue here is a regulatory taking. A takings claim is ripe if it is alleged that the government action denied the individual of "all economically beneficial or productive use of [its] property," and they cannot obtain just compensation in a state court proceeding or that available state procedures are inadequate. <u>126th Ave. Landfill, Inc.</u>, 2009 WL 1544030 at *1 n. 2; <u>Rymer</u>, 764 F.2d at 800.

Lewis and Fussell state that as a result of Amendment 29 being passed, they lost their permits to fish in the Gulf Reef Fisheries due to the requirement that fifty percent (50%) of their income must be derived from fishing.  Under the Federal Regulations "[t]o obtain or renew a commercial vessel permit for Gulf reef fish, more than 50 [fifty] percent of applicant's earned income must have derived from commercial fishing. 50 C.F.R. § 622.4(a)(2)(v).   Lewis and Fussell argue that without the income from grouper and tilefish, their fishing income fell below the fifty percent (50%) threshold.  Thus, the Plaintiffs argued that Amendment 29 violated their Fifth Amendment right that no property shall be confiscated without due process of law because Amendment 29 resulted in their losing their Gulf Reef Fisheries permit. The Plaintiff Fussell states that even though he was initially allocated a share in the grouper and tilefish harvest, he still lost his permit after Amendment 29 was passed.

The Plaintiff Lewis and Fussell's regulatory takings claim lacks merit.  The MSA  precludes the creation of property interests in fishing permits or privileges. 16 U.S.C. §1853a(b).  Furthermore, the Federal Circuit Court held that fishing permits are not a property interest under the takings clause. American Pelagic Fishing Co. v. U.S., 379 F. 3d 1363, 1373 (Fed. Cir. 2004)   Thus, there can be no Fifth Amendment takings claim because there is no property interest vested in a Gulf Reef Fisheries permit.

<u>*(4) Whether Amendment 29 Violates the MSA Lewis and Fussell Count III*</u>

In Count III of their Amended Complaint, Lewis and Fussell allege that Amendment 29 must be remanded because the Federal Defendants failed to follow the recommendations of the National Academy of Sciences as required by 16 U.S.C. § 1853(d)(5).  In 2007, prior to the Federal Defendants issuing Amendment 29, Congress repealed 16 U.S.C. § 1853(d)(5).  Therefore, the requirement to consider the report of the National Academy of Sciences was not part of the MSA when Amendment 29 was issued.  As such, no cause of action remains under Lewis and Fussell's Count III.

<u>*(5) Whether Amendment 29 Violates MSA 16 U.S.C. § 1853a(c)(6)(D)(i & ii)  Lewis and Fussell Count IV*</u>

Count IV alleges first that the Federal Defendants failed to develop a "community sustainability plan"; second, it failed to authorize that the limited access privilege be issued under the system to persons who substantially fished the fishery; third, the Federal Defendants violated 16 U.S.C. § 1853a(c)(6)(D)(i & ii) because the Plaintiffs Lewis and Fussell and others who substantially fished the Gulf Reef Fisheries for grouper and tilefish were denied a vote in the referendum for Amendment 29.

<u>(a) Whether the Federal Defendants Failed to Develop a Community Sustainability Plan</u>

Lewis and Fussell allege the Federal Defendants violated 16 U.S.C. § 1853a(c)(3)(A)(i)(IV) because they did not develop a "community sustainability plan" that must also include those that have not historically participated in the fishery "based on criteria developed by the Council that have been approved by the Secretary and published in the Federal Register."  The Plaintiffs Lewis and Fussell misplace the burden of developing a "community sustainability plan" upon the Federal Defendants.  Under the statute, the Federal Defendants have no obligation to develop a "community sustainability plan." The Statute reads in pertinent part:

> To be eligible to participate in a limited access privilege program to harvest fish, a fishing community shall— . . .
> (IV) develop and submit a community sustainability plan to the Council and the Secretary that demonstrates how the plan will address the social and economic development needs of coastal communities, including those that have not historically had the resources to participate in the fishery, for approval based on criteria developed by the Council that have been approved by the Secretary and published in the Federal Register.

16 U.S.C. § 1853a(c)(3)(A)(i)(IV).  It is clear under the language used in the statute that the fishing communities themselves are responsible for the development of a "community sustainability plan." The Plaintiffs present no arguments or evidence as to what community–if any– was denied proper consideration under the terms of the MSA.  Instead, the Plaintiffs Lewis and Fussell merely make the allegation that the Federal Defendants violated the MSA because they failed to develop a "community sustainability plan."  The argument set forth by Lewis and Fussell improperly shifts the burden to establish a "community sustainability plan" upon the Federal Defendants which is contrary to the plain language in the statute.   Thus the argument presented by Lewis and Fussell fails because it is contrary to the law. See Celotex, 477 U.S. at 322-23 (failure to show sufficient evidence

of any essential element is fatal to the claim).  Thus, the matter should be decided in favor of the Federal and Intervenor Defendants.

### (b) Whether Amendment 29 Failed to Authorize Limited Access to Persons Who Substantially Fished the Fishery

Under the MSA, the initial allocation of all IFQs shall be "issued under the system to persons who substantially participate in the fishery." 16 U.S.C. § 1853a(c)(5)(E).  The Plaintiffs, Lewis and Fussell argue that Amendment 29 prevented seventy percent (70%) of those who "substantially fished" the fishery from voting in the referendum on Amendment 29.  The Federal Defendants argue that NMFS complied with the requirements of 16 U.S.C. § 1853a(c)(5)(E) and that the limited access privilege was "issued under the system to persons who [in fact] substantially participate in the fishery.

The MSA does not define the term "substantially fished" so the Court must give deference to the NMFS's interpretation of the term unless the definition is arbitrary, capricious, or manifestly contrary to statute. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S. Ct. 2778, 81 L. Ed. 693 (1984) (recognizing "that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations.").  To determine whether an agency decision is arbitrary and capricious the Court must consider whether the decision was based upon the consideration for the relevant factors and whether there has been a clear error of judgment. Miccosukee Tribe of Indians of Florida v. U.S. Army Corps of Eng'rs, 420 F. Supp. 1324, 1331 (S.D. Fla. 2006).  Under this standard, the Court should not substitute its judgment for that of an

agency. <u>Id.</u>  The Federal Defendants (Gulf Council) defined "substantially fished" as "represent[ing]

substantial contribution to the overall fishery production in total harvest, annual harvest, in combination with the persistence demonstrated by maintaining a high level of harvest over the period 1999-2004. (Ar. 10926).  The Federal Defendants state that using those years as control dates was the most straight-forward, readily identifiable, and accurate means of identifying whether a participant has substantially fished for grouper or tilefish species." (Ar. 10926).  The Federal Defendants determined to distribute initial IFQ shares proportionately among eligible participants based on the average annual landings from logbooks associated with their current permit(s) during the time period 1999 through 2004, with an allowance for dropping one (1) year. (Ar. 12967-12968). The participants were deemed to have "substantially fished" the reef if they landed 8,000 pounds of grouper and/or tilefish per permit within each of the years between 1999 and 2004 with the ability to drop one year if it fell below the 8,000 pound limit. (Ar. 10924).

The Plaintiffs Lewis and Fussell and the *Amicus Curia* Food and Water Watch (FWW) argue that the limits imposed by the Federal Defendants were not expansive enough and should have included fishermen who whose landings were lower than the 8,000 pound limit used by the NMFS. (Ar. 10924).

In making its determination, the NMFS reviewed landing limits ranging from 1,000 pounds per year per permit, 4,000 pounds per year per permit, and 8,000 pounds per year per permit. (Ar. 12170).  The Federal Defendants choose the 8,000 pound limit because it included the individuals that landed approximately ninety percent (90%) of the grouper and tilefish taken during the control years from 1999 through 2004. (Ar. 10924-10936, 12170).  The Federal Defendants determined that the 8,000 pound landings limit was below the average and mean value of landings per permit and

is well below the lower bound of the confidence interval for annual average landings. (Ar 10935). The Gulf Council rejected landings limitations of 4,000 pounds and 1,000 pounds because it determined that those lower limits might extend the referendum vote to those permit holders who did not "substantially fish" for grouper and tilefish. (Ar. 10935).   The Federal Defendant's determination as to who should be allowed to vote in the referendum on Amendment 29 was not arbitrary and capricious because the Federal Defendants took into consideration the relevant harvest data including reviewing other options related to annual catches per permit before making their determination.  Under the deferential standard announced in Chevron, the Court should not substitute its judgment for those of an agency where the agency decision was based upon the relevant factors. Miccosukee Tribe of Indians, 420 F. Supp. at 1331.

(c) *Whether the Federal Defendants violated 16 U.S.C. § 1853a(c)(6)(D)(i & ii)*

The Plaintiffs argue that Amendment 29 violated 16 U.S.C. § 1853a(c)(6)(D)(i & ii) because Plaintiffs Lewis and Fussell and other similarly situated fishermen, who had "substantially fished" the reef fish species, were denied opportunity to vote on the IFQ referendum.[5]  The *Amicus* FWW argues that the Federal Defendants catch threshold used to establish voter eligibility for the Amendment 29 referendum violated the MSA because it excluded nearly seventy percent (70%) of the fisherman who fished the Gulf Reef Fishery.  The *Amicus* FWW further argues that the cutoff determination at 8,000 pounds was arbitrary and capricious.

---

[5]        The Court notes the Plaintiff Lewis states he obtained a permit in 2002, yet he did not fish the reef for grouper and tilefish until 2005.  Thus, it would be extremely difficult for the Federal Defendants or anyone else to view his activities, at least in regard to fishing the Gulf reef for grouper and tilefish, as substantial.

The statute reads in pertinent part:

> (i) [e]xcept as provided in clause (iii) for the Gulf of Mexico commercial red snapper fishery, the New England and Gulf Councils may not submit, and the Secretary may not approve or implement, a fishery management plan or amendment that creates an individual fishing quota program, including a Secretarial plan, unless such a system, as ultimately developed, has been approved by more than 2/3 of those voting in a referendum among eligible permit holders, or other persons described in clause (v), with respect to the New England Council, and by a majority of those voting in the referendum among eligible permit holders with respect to the Gulf Council.   For multispecies permits in the Gulf of Mexico only those participants who have substantially fished the species proposed to be included in the individual fishing quota program shall be eligible to vote in such a referendum.  If an individual fishing quota program fails to be approved by the requisite number of those voting, it may be revised and submitted for approval in a subsequent referendum.
>
> (ii) [t]he Secretary shall conduct a referendum under this subparagraph, including notifying all persons eligible to participate in the referendum and making available to them information concerning the schedule, procedures, and eligibility requirements for . . . referenda and to conduct such referenda in a fair and equitable manner.

16 U.S.C. § 1853a(c)(6)(D)(i & ii).

The statute defines eligible permit holders as those who substantially fished the fishery. However, as noted above, the term "substantially fished" is not defined by statute and thus, the Court must give deference to the NMFS's interpretation.  Chevron, U.S.A., Inc., 467 U.S. at 844.  The Federal Defendants defined the term "substantially fished" as those who represented substantial contribution to the overall fishery production in the total harvest. (Ar. 12268-12269).  In reaching that determination, the Federal Defendants considered five alternatives to ascertain the  eligibility of the electorate and four alternative apportionment methods that could be used to distribute the initial IFQ shares to the programs eligible participants.  (Ar. 12964,12967-12968).

After reviewing the alternatives, the Federal Defendants defined the term "substantially fished" using the control date years of 1999 through 2004 and using 8,000 pounds as the annual

catch yield to select who would be eligible to vote in the referendum on Amendment 29.   The individuals who were selected  constituted nearly ninety percent (90%) of the total catch of grouper and tilefish during those years.   While the *Amicus* FWW argues that the 8000 pound limit was arbitrary, it is clear from the record that the Federal Defendants considered other annual harvest limits per permit prior to settling on the 8000 pound limit. (Ar. 10924-10936).   In fact, the Federal Defendants considered five alternatives to determine initial share eligibility and four alternative apportionment methods that could be used to distribute initial IFQ shares to eligible program participants demonstrates that the decision was throughly considered and not arbitrary and capricious. (Ar. 12964, 12967-12968).

The Gulf Council rejected landings limitations of 4,000 pounds and 1,000 pounds because it determined that those lower limits might extend the referendum vote to those permit holders who did not "substantially fish" for grouper and tilefish. (Ar. 10935).   Moreover, even though the eligible voters only made up thirty percent (30%) of the total fishery, they landed the overwhelming majority of grouper and tilefish (90%) during the control period.   The Federal Defendants then applied this information and drew a line limiting the individuals who could participate in the referendum based on that criteria, which was provided by the participants own logbooks regarding the individual fisherman annual harvest of 8,000 pounds per permit.

The Federal Defendants reviewed several options and provided the rationale for the final criteria used to develop the electorate for the referendum on Amendment 29.   When the administrative agency provides relevant data, as they did here, supporting its decision, the Court owes deference to the agency's line drawing. Yakutat, Inc. v. Gutierrez, 407 F. 3d 1054, 1072 (9th Cir. 2005).   Thus, the Court should not disturb the Federal Defendants' eligibility determination.

*(6) Whether Amendment 29 Violates the MSA's National Standard's*

Any Fisheries Management Plan (FMP), plan amendment, or implementing regulation must be consistent with the MSA's ten national standards for fishery conservation and management. <u>Ocean Conservancy v. Evans</u>, 260 F. Supp. at 1177.  In Counts V through VIII, the Plaintiffs Lewis and Fussell assert that Amendment 29 violates the MSA's National Standard numbers 1, 2, 4, 5, and 9.  The Plaintiff Coastal Conservation argues that Amendment 29 violates National Standard numbers 1, 2, 8, and 9.

*National Standard Number 1*

National Standard Number 1 reads in pertinent part: "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1).   The Plaintiffs Lewis and Fussell state that the grouper and tilefish are not overfished and that overfishing is not occurring. They further contend that since many fishing permits will be revoked as a result of Amendment 29, and the Amendment does not encourage the optimum yield for the fishery.  The Plaintiff Coastal Conservation argues that the Federal Defendant's ignored the effect of the recreational sector on Amendment 29 and thereby failed to determine whether or not overfishing would occur in the fishery.  The Federal Defendants state that the purpose of Amendment 29 is to prevent the problems created by the over capitalization within the commercial fishery and thereby promote the optimum yield and not to prevent specific overfishing. (Ar. 12947).

The term "optimum," with respect to the yield from a fishery, means the amount of fish which:

> (A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems;
> (B) is prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor; and
> (C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery.

16 U.S.C. § 1802(33)(A)-(C) (1996).  The Federal Defendants argue that Amendment 29 protects the marine ecosystem from the harm caused by the overcapitalization of the fishery.  Part of the purpose of implementing Amendment 29's IFQ program was to improve the physical conditions in the fishery by eliminating overcapitalization.  The Final Environmental Impact Statement issued by the Federal Defendants noted that " IFQs are also expected to foster resource conservation by providing long term incentives to program participants.  As overcapitalization is reduced under an IFQ program, a decrease in adverse impacts to the physical environment should also occur since the number of participants in the fishery is decreased." (Ar. 12950).  According to the EIS, the reduction in overcapitalization would promote the optimum yield in the fishery because it would improve the safety of the fishing fleet, increase efficiency of the overall catch by reducing costs, create more flexibility in the fishing season as the season would be open all year to permit holders, improve the supply of fresh fish into the market place, and increase profits to the fisherman who remain in the fishery. (Ar. 12947-12949).  Similar results were achieved by implementing an IFQ program for Redfish in the Gulf of Mexico. (Ar. 12948).  Thus, Amendment 29's IFQ plan meets the requirements of National Standard number 1.

The Plaintiff Coastal Conservation's argument that Amendment 29 fails to consider the impact of the recreational sector on potential overfishing lacks merit.  Amendment 29 does not change the overhall harvest of grouper and tilefish in either the commercial or recreational sectors.

While there is no overfishing impact based upon Amendment 29's IFQ program, the studies performed in preparing Amendment 29 tend to show that initiating an IFQ program in the grouper and tilefish fishery would result in efficiency gains. (Ar. 12950). Thus, Amendment 29 will tend to achieve, on a continuing basis, the optimum yield from the grouper and tilefish fishery.

<em>National Standard Number 2</em>

National Standard number 2 reads in pertinent part: "Conservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2). Lewis and Fussell merely state that the Federal Defendants did not base their decision upon the best scientific information available. The Plaintiff Coastal Conservation argues the Defendant did not take into account scientific data related to the impact Amendment 29 would have upon the recreational sector.

Under the MSA, "[s]cientific information includes, but is not limited to, information of a biological, ecological, economic, or social nature." Scallop Fishermen, 720 F. Supp. 2d at 581. To prevail on a claim challenging an amendment to an FMP under National Standard 2, the plaintiffs must demonstrate that "superior or contrary data was available and that the agency ignored such information." Id. (citing North Carolina Fisheries Ass'n v. Gutierrez, 518 F. Supp. 2d 62, 85 (D.D.C. 2007). "It is well settled . . . that the Secretary can act when the available science is incomplete or imperfect, even where concerns have been raised about the accuracy of the methods or models employed." Scallop Fishermen, 720 F. Supp. 2d at 581.

In this instance, the Federal Defendant's used the annual catch information provided from the participant permit holders own logbooks. The Federal Defendants also reviewed the total annual catch by logbook during the years 1995 through 2004 and 1999-2004. Additionally, the Federal

-47-

Defendants prepared an Environmental Impact Statement (EIS) that reviewed the effects of Amendment 29 on the environment as well as considered the effect on recreational fishermen. The EIS considered the number of recreational participants in the fisheries, the number of recreational fishing trips taken, and the amount of fish that were annually harvested by recreational fisherman. (Ar.13049-13050). The Federal Defendants submitted detailed records of the nature of the science and studies it relied upon in the EIS. (Ar. 12916-13216).

Under the statute, the Plaintiff's are required to refute the data and studies provided by the Federal Defendants with superior or contrary data. North Carolina  Fisheries Association, 518 F. Supp. 2d at 85.  The Plaintiff's did not provide any contrary data, but merely made conclusory allegations regarding the data used and presented by the Federal Defendants.  The Plaintiff's argument related to National Standard number 2 lacks merit.  The decision of the Federal Defendants was supported by sufficient scientific data; even if it was incomplete, it was sufficient to make a decision on Amendment 29.  As noted above, the Federal Defendants can act when the available science is incomplete or imperfect, even where concerns have been raised about the accuracy of the methods or models employed.  General Category Scallop Fishermen,  720 F. Supp. 2d at 581.

*National Standard Number 4*

National Standard Number 4 reads in pertinent part:

> Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

16 U.S.C. § 1851(a)(4).  The Plaintiffs Lewis and Fussell voluntarily withdrew their complaint in regards to National Standard number four.  Thus the issue is moot.

### *National Standard Number 5*

National Standard number 5 reads in pertinent part:  "[c]onservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose."  16 U.S.C. § 1851(a)(5).  The Plaintiffs Lewis and Fussell argue that only one species, gag grouper, is actually overfished and that all Amendment 29 did was redistribute access to the fishery because the total harvest by weight was not reduced.  As such, they state Amendment 29 is simply the economic reallocation of the total harvest of grouper and tilefish from one hundred percent (100%) of the fishermen in the fishery to thirty percent (30%) of the participants in the fishery.  Lewis and Fussell continue that Amendment 29 did not comply with 50 C. F. R. § 600.330(c)(2) and (d).  The Federal Defendants argue that the purpose of Amendment 29 is to reduce overcapitalization in the fishery and not to reduce the overall harvest of grouper and tilefish.

The purpose of Amendment 29 is to reduce the over capitalization of the grouper and tilefish industry in the Gulf Reef Fishery. Contrary to the Plaintiffs Coastal Conservation's argument, it is well within the discretionary power of the Secretary to make allocations restricting access to the Gulf Reef Fishery to prevent overcapitalization. 50 C.F.R. § 600.325(b)(3)(i).  The Federal Defendants point out that implementing Amendment 29's IFQ program would reduce overcapitalization in the Gulf Reef Fishery, lengthen the fishing season to all year round, lower operating costs, improve market conditions, increase the price of ex-vessel prices, and improve the safety at sea and working

conditions. (Ar. 12784). Amendment 29 would also cause marginal and less efficient operations to exit the fishery. (Ar. 12784). The Federal Defendants stated the IFQ program would eliminate seasonal product gluts and ensure a steadier supply of fresh fish leading to higher prices and improved product quality. (Ar. 12785). The IFQ program under Amendment 29 would also create a decrease in adverse impacts to the physical environment because the number of participants in the fishery would be reduced as overcapitalization was reduced. (Ar. 12785). Thus, the purpose of Amendment 29 was not solely implemented for an economic purpose, but also for safety, environmental, and market conditions.

50 C.F.R. 600.330(c)(2) and (d) require the agency to consider certain factors when implementing a FMP or IFQ program under the MSA. The Regulations read in pertinent part:

> (2) *Factors to Consider.* The Magnuson-Stevens Act ties the use of limited access to the achievement of OY [optimum yield]. An FMP that proposes a limited access system must consider the factors listed in section 303(b)(6) of the Magnuson-Stevens Act and in §600.325(c)(3). In addition, it should consider the criteria for qualifying for a permit, the nature of the interest created, whether to make the permit transferable, and the Magnuson-Stevens Act's limitations on returning economic rent to the public under section 304(d). The FMP should also discuss the costs of achieving an appropriate distribution of fishing privileges.

> (d) *Analysis.* An FMP should discuss the extent to which overcapitalization, congestion, economic waste, and inefficient techniques in the fishery reduce the net benefits derived from the management unit and prevent the attainment and appropriate allocation of OY. It should also explain, in terms of the FMP's objectives, any restriction placed on the use of efficient techniques of harvesting, processing, or marketing. If, during FMP development, the Council considered imposing a limited-entry system, the FMP should analyze the Council's decision to recommend or reject limited access as a technique to achieve efficient utilization of the resources of the fishing industry.

50 C.F.R. § 600.330(c)(2) and (d).

The Federal Defendants (NMFS) considered the criteria of 50 C.F.R. § 600.330(c)(2) and (d) The Federal Defendant's also noted that Amendment 29's IFQ program would reduce regulatory discards due to season closures being eliminated because the fishermen could then catch their allocations at their convenience. (Ar. 12785).  As noted above, the Federal Defendant's held several hearings throughout the Gulf States  and made announcements in the Federal Register regarding the criteria they planned on using to determine who would be initially allowed to participated in the grouper and tilefish fishery under Amendment 29's IFQ program. (Ar. 12785).  Amendment 29 also addressed the transferability of the commercial reef fish permits for grouper and tilefish from the initial holders to others who are eligible to fish in the Gulf Reef Fisheries. (Ar. 12794). After five (5) years, all potentially  eligible persons that are eligible to participate under the MSA, would be allowed the opportunity to obtain a permit and participate in the IFQ program for grouper and tilefish. (Ar. 12794).  Amendment 29 also capped the total harvest that one individual could take under the IFQ program to prevent one or two enterprises from dominating the grouper and tilefish harvest. (Ar. 12796-12797).  Thus, the Federal Defendants considered all of the criteria required under National Standard 5 and 50 C.F.R. § 600.330(c)(2) and (d).

### *National Standard 8*

National Standard Number 8 reads in pertinent part:

> Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

16 U.S.C. § 1851(a)(8).  The Plaintiff Coastal Conservation argues that Amendment 29 failed to comply with National Standard 8 because the Federal Defendants did not consider the effects of the recreation sector caused by Amendment 29.  Coastal Conservation argues that without any analysis of how Amendment 29 will affect the recreational sector of the fishery, it is impossible to know how Amendment 29 will impact the fishing communities within the reef.

The Federal Defendants did include a discussion of the economic environment affecting both the commercial and recreational sectors.  The Federal Defendants provided a Fishery Social Impact Statement (FSIS) regarding Amendment 29.  The FSIS states "[i]n attempting to access the social impacts of the proposed amendment it must be noted the community level data deficiencies limit the extent of analysis that be conducted." (Ar. 12932).  It appears clear in this instance that there is not a large pool of data regarding the economic impact on the local economies.  However, that should not effect the determination made by the Federal Defendants because National Standard 8 must be read in conjunction with National Standard 2 which states the Federal Defendants must use the best scientific evidence available. The Federal Defendant's found that based on the analysis of landings and permit data "few communities in the Gulf of Mexico region can be described as substantially involved in the grouper and tilefish fisheries and fewer, if any could be argued to be dependent on these species." (Ar. 12932).  The Federal Defendants noted that the resultant analysis may not fully predict all social impacts that would be expected to occur. (Ar. 12932).

Contrary to the Plaintiffs position, the Federal Defendants did consider the impact on the recreational sector.  The study provided by the Federal Defendant's noted that "it [was] difficult to assess what affects past and or present management measures have had on anglers because the amount of effort by the private sector has continually increased." (Ar. 13152).  The FSIS noted that

even with increased limitations placed upon some Gulf species, specifically since 1990, recreational fishing increased from just over six (6) million trips in 1981 to over fourteen (14) million trips in 2004. (Ar. 13152).

The FSIS also stated that the for hire fishery has benefitted from past actions in the reef fish fishery. (Ar. 13152). The FIS noted that when bag limits created short term negative impacts on the recreational sector, the recreational fishermen moved to other species. (Ar. 13152-13153). The FSIS concluded that even though the recreational sector may be harmed in the short term, the recreational fishing industry would benefit in the long term. (Ar. 13154). The FSIS further noted that as the harvest approached optimum yield, it would create an increase in recreational participation. (Ar. 13154). While the short term economic effects must be taken into account, those effects were not meant to trump the real purpose of the MSA, which is to preserve and protect the United States fisheries. Recreational Fisheries Alliance v. Evans, 172 F. Supp. 2d 35, 46 (D.D.C. 2001). The law only requires the Federal Defendant's to minimize adverse impacts on fishing communities to the extent practicable. Id.

Thus, the Federal Defendants did consider the effects of Amendment 29 on the recreational sector and determined that the recreational sector would benefit in the long run from the changes made by Amendment 29. (Ar. 13154). As a result, the Court must conclude that the Federal Defendants complied with MSA National Standard 8.

### *National Standard 9*

National Standard 9 states in pertinent part:

> Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.

16 U.S.C. § 1851(a)(9).  Bycatch is defined as "fish which are harvested in a fishery, but which are not sold or kept for personal use, and includes economic and regulatory discards." 16 U.S.C. § 1802(2).  Regulatory discards are "fish harvested in a fishery, which the fishermen are required by regulation to discard whenever caught, or are required by regulation to retain, but are not sale." 16 U.S.C. § 1802(38).

The Plaintiffs Lewis and Fussell argue that Amendment 29 violates MSA National Standard 9 because it increases the bycatch as well as the mortality of the bycatch, does not give priority to avoiding the capture of bycatch species, did not calculate the net benefit to the nation by considering the negative impacts set forth in 50 C.F.R. § 600.350(d)(1-3), and failed to adhere to FAO Code of Conduct for Responsible Fisheries.

The Plaintiff Coastal Conservation contends that Amendment 29 fails to comply with National Standard 9 because it does not provide for any measures to mitigate the increased bycatch that naturally resulted from reducing the number of fishermen that fish for grouper and tilefish. Many of the commercial fishermen that were excluded from fishing for grouper and tilefish still fish the Gulf Reef Fishery for other species, however, they still catch grouper and tilefish which must then be thrown back into the Gulf.  Amendment 29 does not compensate for those grouper and tilefish that are thrown back which have a high mortality rate.  The *Amicus* FWW argues that while Coastal Conservation addressed the issue  that Amendment 29 failed to minimize bycatch with

respect to vessels that received little quota share, it is also true that Amendment 29 failed to explain how it would minimize bycatch from those fishermen that received the bulk of the quota shares.

The Federal Defendants respond that Amendment 29 will ultimately reduce bycatch because Amendment 29 favors more efficient operations. (Ar. 13009).  The Federal Defendants point out that the EIS found that efficient operations spend less time chasing the same amount of fish as do less efficient operations. (Ar. 13009).   Thus, you have a lower impact on the physical and biological/ecological  environmental than you have with less efficient operations because the more efficient operations minimize the amount of time spent interacting with the fishery inhabitants and thus you have less bycatch and discards. (Ar. 13009).  The Federal Defendants note bycatch was reduced for red snapper in the Gulf when a similar IFQ program was introduced. (Ar. 13009).

The Intervenor-Defendants, the Gulf of Mexico Reef Fish Shareholders' Alliance and Environmental Defense Fund (Intervenor-Defendants) state that the Plaintiffs allegation that those who lost their permits to fish for grouper and tilefish will increase bycatch lacks merit because under 50 C.F.R. § 622.20(c)(4), those catching grouper or tilefish without a permit may purchase a quota share from those that have a permit as long as they have a valid Gulf Reef Fisheries permit. 50 C.F.R. § 622.20(c)(4).

Contrary to the position of Lewis and Fussell and the *Amicus* FWW, Amendment 29 will reduce bycatch. The Federal Defendants noted that "under an IFQ program, regulatory discards due to seasonal closures are eliminated because fishermen can catch their allocation at any time during the year." (Ar. 12830).  Amendment 29 would also tend to eliminate "ghost fishing," which refers to fish killed by abandoned or lost fishing gear, because Amendment 29 would eliminate derby style fishing and crews would no longer have to race to catch fish. (Ar. 12830).  Amendment 29 allows

a multi-use allocation for gag and red grouper which will further reduce discards because it allows the fishermen to use a small portion of their allowance for one species to harvest the other that would otherwise be cast out as a discard. (Ar. 12830).

Amendment 29 also changes some classifications on grouper species from DWG (deep water grouper) to SWG (shallow water grouper) and vice versa. (Ar. 12830). The changes will allow fisherman to count a DWG species like Warsaw grouper or Spickled Hind to be considered as an SWG species after an IFQ account holder's DWG allocation has been filled up. (Ar. 12830). Likewise an  SWG species such as a Scamp can be considered as a DWG species after the IFQ holders SWG allocation has been completed.  Allowing species which are caught in both shallow water and deep water to be harvested as if they were one species will reduce bycatch discards on those species because the fisherman may count DWG landings against his SWG allocation if his DWG limit has been used up and vice versa.

Further, Amendment 29 allows IFQ program participants to exceed their allocation by ten percent (10%) which will be deducted from the next years allocation. (Ar. 12830).  Allowing the permit holders to exceed their allocation will prevent the discard of any overages and thereby reduce bycatch.  The reduction in bycatch outlined by the Federal Defendants has been proven successful under the similar Red Fish IFQ which was issued in 2007.  Thus the Federal Defendants' claims are supported by actual practice in the Gulf Reef Fishery. (Ar. 12830).  As such, the Federal Defendants addressed the issue of bycatch and established that bycatch will actually be reduced under Amendment 29 rather than increased as alleged by the Plaintiffs.

### (7) Whether Amendment 29 Violates the National Environmental Policy Act (NEPA).

NEPA establishes procedures that agencies are required to follow before taking a "major" action-defined as an action that "significantly affect[s] the quality of the human environment." Citizens for Smart Growth v. Peters, 716 F. Supp. 2d 1215, 1221 (S.D. Fla. 2010) (citing 42 U.S.C. § 4332(C)). However, NEPA only requires that an agency followed the prescribed procedure; it does not mandate any particular result, and agencies are free to come to any decision, including a decision that other values outweigh environmental costs, as long as the adverse environmental effects are adequately identified and evaluated. Sierra Club v. Van Antwerp, 526 F. 3d 1353, 1361 (11th Cir. 2008).   The Supreme Court held that "[a] court can only find a federal agency's attempted NEPA compliance inadequate where it is arbitrary, capricious, or an abuse of discretion" in violation of the APA. Sierra Club v. Van Antwerp,   526 F. 3d 1353, 1361 (11th Cir.2008) (citing Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 548, 98 S. Ct. 1197, 55 L. Ed. 2d 460 (1978)).   The only role of a reviewing court is to ensure that the agency took a "hard look" at the environmental consequences of a proposed action as required by NEPA. Citizens for Smart Growth, 716 F. Supp. 2d at 1221 (citing Druid Hills Civic Ass'n, Inc. v. Federal Highway Administration, 772 F.2d 700, 709 (11th Cir.1985). The party challenging the agency action has the burden of showing, by a preponderance of the evidence, that the agency did not comply with the requirements of NEPA. Citizens for Smart Growth, 716 F. Supp. 2d at 1221 (citing Druid Hills Civic Association, 772 F.2d at 709 n. 9 (citing Sierra Club v. Callaway, 499 F.2d 982, 992 (5th Cir.1974)); Envtl. Defense Fund, Inc. v. Corps of Eng'rs,   492 F.2d 1123, 1130-31 (5th Cir.1974)).

The Plaintiff Coastal Conservation argued that the Federal Defendants did not consider the environmental impact of Amendment 29 on the recreational participants within the fishery.  The

*Amicus* FWW states that Amendment 29 violates NEPA because it failed to evaluate all of the environmental impacts from its actions, has an improper purpose, and failed to evaluate reasonable alternatives.

### (a) Coastal Conservation's NEPA Claim

The Plaintiff Coastal Conservation contends NEPA was violated because the Federal Defendants ignored the environmental impact Amendment 29 would have on the recreational sector within the Gulf Reef Fishery. The Plaintiff Coastal Conservation argues that by looking exclusively at permitted commercial participants within the fishery, the Federal Defendants have ignored how Amendment 29 could impact the environment through its effects upon recreational participants within the fishery. Coastal Conservation further states the Federal Defendants failed to consider the adverse impact of each of the alternatives it reviewed on the recreational sector. Thus, Coastal Conservation argues that Amendment 29 is arbitrary and capricious because it failed to consider the impact upon a large sector in the Gulf Reef Fishery.

In essence, Coastal Conservation is arguing the scope of review performed by the Federal Defendants in assessing Amendment 29 was too narrow because it did not include information regarding the recreational sector with respect to each alternative considered in the Final Environmental Impact Statement (FEIS). The stated purpose of Amendment 29 is to "rationalize effort and reduce overcapacity in the commercial grouper and tilefish fisheries in order to achieve and maintain optimum yield (OY) in these multi-species fisheries." (Ar. 12926). Thus, the focus of the Federal Defendants in developing and issuing Amendment 29 centered around the impact it would have on the stated purpose of the amendment – the commercial sector of the Gulf Reef Fishery.

Contrary to Coastal Conservation's argument, the Federal Defendants did consider the impact of Amendment 29 on the recreational sector, just not in regards to every single option considered in the process. The FEIS considered the effect of Amendment 29 on the recreational sector in regards to the potential economic impact. (Ar. 12049-12051). The Federal Defendants further noted that:

> [a]ctions contain Amendment 29 are not directed at the recreational sector of the Gulf reef fishery and as such do not present many potential impacts to the recreational sector. The establishment of the IFQ does not change the TAC, [total allowable catch] nor does it change the allocation between the recreational and commercial sectors.

(Ar. 12830). Thus, the Federal Defendants established a set of parameters that focused on the commercial sector as opposed to the recreational sector because Amendment 29 was developed to prevent the overcapitalization of the commercial sector. Setting the parameters for a study is well within the agency's discretion in preparing an FEIS as long as it allows for a study of the cumulative impacts and analysis of the alternatives. Citizens for Smart Growth, 716 F. Supp. 2d at 1225. Using those parameters, the Federal Defendants completed a detailed FEIS that fully complied with the standards set forth in NEPA.

While Coastal Conservation argues that the Federal Defendants failed to consider the impact upon the recreational sector, a court can only find a federal agency's attempted NEPA compliance inadequate where it is arbitrary, capricious, or an abuse of discretion in violation of the APA. Van Antwerp, 526 F.3d at 1361. This standard requires substantial deference to the agency, not only when reviewing decisions like what evidence to find credible and whether to issue a FONSI or EIS, but also when reviewing drafting decisions like how much discussion to include on each topic and how much data is necessary to fully address each issue. Id. The FEIS in this instance is a 300 page report that considered several alternatives addressing areas such as the management of the restrictions imposed

by the Amendment, the affected physical impacts on the physical, biological, and economic, impact to fishery, as well as the social consequences, and a detailed discussion of the environmental alternatives involved in regards to each of those areas of concern. (Ar. 12916-13217).  The FEIS is only required to furnish such information as appears to be reasonably necessary for the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless or well nigh impossible. Citizens for Smart Growth, 716 F. Supp. 2d at 1225 (citing Florida Wildlife Federation v. Goldschmidt, 506 F. Supp. 350, 375 (S.D. Fla. 1981)).  Upon review of the FEIS, it is clear the Federal Defendants considered numerous alternatives and sub-alternatives for each area of potential impact on the commercial sector and also included such areas they believed may have an impact on the recreational sector.  It must also be noted that Amendment 29 was prepared solely for the commercial sector and that the restrictions placed on the harvest of grouper and tilefish in the commercial sector does not impact the harvest in the recreational sector.  Given the precondition that deference must be paid to the Federal Defendants decision in regard to the scope of assessing Amendment 29's impact, the Court does not find good cause to impose a broader range of alternatives or considerations of other groups.  The Plaintiffs' arguments that groups not considered by the Federal Defendants or not considered to the extent demanded by the Plaintiffs in their Complaint make the FEIS arbitrary and capricious fails due to the extensive nature of the FEIS produced by the Federal Defendants.  Therefore, the Court recommends that the scope of the Federal Defendants in making its determinations included in the FEIS were not arbitrary nor capricious.

### (b) The Amicus FWW's NEPA Argument

The *Amicus* FWW argues that Amendment 29 violates NEPA because it fails to evaluate all of the  environmental impacts from its actions, the statement of purpose and need was improper, and it failed to evaluate reasonable alternatives.

### (i) Whether Amendment 29 Takes a Hard Look at the Environmental Consequences of Its Actions

The purpose of NEPA is to make sure that federal agencies are fully aware of the impact of their decisions on the environment. P'ship for a Sustainable Future, Inc. v. U.S. Fish and Wildlife Serv., 2002 WL 33883548 *5 (M.D. Fla. July 12, 2002). NEPA is not a substantive environmental statute which dictates a particular outcome if certain consequences exist. Id.  Instead NEPA creates "a particular bureaucratic decision making process." Id. (quoting  Sierra Club v. Marsh, 872 F.2d 497, 497 (1st Cir.1989)).  It establishes "action-forcing" procedures that require agencies to take a "hard look" at environmental consequences.  P'ship for a Sustainable Future, 2002 WL 33883548 at *5 (citing Kern v. United States Bureau of Land Mgmt., 284 F.3d 1062, 1066 (9th Cir.2002)). NEPA only requires that an agency follow the prescribed procedure; it does not mandate any particular result, and agencies are free to come to any decision, including a decision that other values outweigh environmental costs, as long as the adverse environmental effects are adequately identified and evaluated. Citizens for Smart Growth, 716 F. Supp. 2d at 1225.  Further agencies need not analyze remote and speculative environmental impacts. Id.

The *Amicus* FWW contends that the Federal Defendants failed to analyze the impacts of various management options on bycatch, in particular sea turtles, or analyze the bycatch impacts caused by the use of bottom long lines which is the primary gear used in the fishery.

In fact, the Federal Defendants did analyze the effect of long lines on sea turtle bycatch as a result of Amendment 29.  The Federal Defendants found that under an IFQ system there will be:

> [a] cost advantage for longline gear. Vertical line vessels that cannot match the costs attained on longline boats will find quota ownership costly and will face incentives to either switch gear types or exit the fishery. The model predicts that harvesting permits will gravitate to the hands of longline gear vessel operators.

(Suppl. Ar. 7555). The IFQ model further predicted  that "share of the total reef fish catch that was currently harvested by longline gear vessels would increase under the IFQ program." (Ar. 7558). NEPA only requires that an agency followed the prescribed procedure; it does not mandate any particular result, and agencies are free to come to any decision, including a decision that other values outweigh environmental costs, as long as the adverse environmental effects are adequately identified and evaluated. Van Antwerp,  526 F. 3d at 1361.  In this context, the Federal Defendants found that the benefits of reducing the over capitalization in the grouper and tilefish fishery was of more value than the danger imposed by the use of longlines and their impact on sea turtles.

With respect to the bycatch impact on sea turtles the Federal Defendants noted:

> [a]ll five species of sea turtles are adversely affected by the Gulf reef fishery.  Incidental captures are  relatively infrequent for commercial vertical line vessels and recreational hook-and-line components of the reef fishery.   Sea turtle are more frequently encountered by commercial longline vessels, with an estimated 974 (95% C.I. =444- 2,137) hard shell turtles captured between July 2006 and December 2007 (SEFSC 2008).  Captured sea turtles can be released alive or can be found dead upon retrieval of the gear as a result of forced submergence.  Sea turtles released alive may succumb to injuries sustained at the time of capture or from exacerbated trauma from fishing hooks or lines that were ingested, entangling, or otherwise still attached when they were released.  Sea turtle release gear and handling protocols are required to minimize post-release mortality.

(Ar. 13066).  Based upon the impact of longlines on the fishery, the Gulf Council developed a separate amendment–Amendment 31– to the reef FMP that reduced sea turtle takes by the longline portion of the fishery.  The longline amendment underwent scoping in December 2008 and was finalized as Amendment 31 which was issued seven (7) months prior to Amendment 29.

Thus, the Federal Defendants complied with NEPA by taking a "hard look" at the impact of longlines within the fishery and in particular upon sea turtles and addressed the situation under an accessorial amendment specifically tailored to use of longlines including the impact they have on sea turtles. (Ar. 13134).  After the Federal Defendants took a "hard look" at the impact of longline fishing and the environmental impact on sea turtles, no further action was needed. Citizens for Smart Growth, 716 F. Supp. 2d at 1221(citing Druid Hills, 772 F.2d at 709) (holding that the only role of a reviewing court is to ensure that the agency took a "hard look" at the environmental consequences of a proposed action as required by NEPA); Partnership for a Sustainable Future, 2002 WL 33883548 at *5.  Even if the Federal Defendants had not issued Amendment 31, no grounds exist to remand Amendment 29 under NEPA, because the Federal Defendants were not required to act in any certain manner after taking that "hard look." Id.  NEPA only requires that an agency followed the prescribed procedure; it does not mandate any particular result, and agencies are free to come to any decision, including a decision that other values outweigh environmental costs, as long as the adverse environmental effects are adequately identified and evaluated. Van Antwerp, 526 F. 3d at 1361; Citizens for Smart Growth, 716 F. Supp. 2d at 1221 (holding that NEPA is not a substantive environmental statute which dictates a particular outcome if certain consequences exist); Partnership

for a Sustainable Future, 2002 WL 33883548 at * 5.  The Federal Defendants were not required to

act in any certain manner after taking that "hard look"

The Amicus FWW's argument is more of a policy dispute with the Federal Defendants over

the effects of Amendment 29, rather than an allegation that the procedures under NEPA were

violated.  While the Federal Defendants found that the benefits of reducing the over capitalization

in the grouper and tilefish fishery was of more value than the danger imposed by the use of longline

fishing and its impact on sea turtles, they did address the longline and turtle bycatch issues in

Amendment 31.   Consequently, the Federal Defendants did not violate NEPA by concluding that

the IFQ program under Amendment 29 should go forward because they took the necessary "hard

look" at longline fishing and sea turtle bycatch.

### (ii) Whether the Federal Defendants Failed to Consider Alternatives

The *Amicus* FWW claims that the Federal Defendants failed to analyze or look at preferred

alternatives like endorsements rather than the IFQ program.  Section 102(2)(C)(iii) of NEPA, 42

U.S.C. § 4332(2)(C)(iii), specifically requires an EIS to contain a detailed statement of alternatives

to the proposed action.  Druid Hills,  772 F.2d at 712-13 (quoting Vermont Yankee Nuclear Power

Corp. v. Natural Res Defense Council, Inc.,  435 U.S. 519, 551, 98 S. Ct. 1197, 55 L. Ed. 2d 460

(1978).  The alternatives section is the heart of the EIS, 40 C.F.R. § 1502.14 (1984), and serves to

insure that the decision making body has actually considered other appropriate methods of attaining

the desired goal. Druid Hills,  772 F.2d at 712 (citing Sierra Club v. Morton,  510 F.2d 813, 825

(1975)). Consideration of alternatives forces the government agency to evaluate fully the

environmental effects of the proposal and to compare those impacts with the environmental consequences of the suggested alternatives. Druid Hills, 772 F.2d at 712.

The content and scope of the discussion of alternatives to the proposed action varies with the existing circumstances. Id. 712-13. Generally, the EIS should "go beyond mere assertions" by providing sufficient information and reasoning to enable readers to consider and evaluate the comparative merits of the alternatives on their own and to comment on the EIS. Id. at 713 (citing Natural Resources Defense Council, Inc. v. Callaway, 524 F.2d 79, 93 (2d Cir.1975)). Federal regulations require that the agency devote "substantial treatment" to and "rigorously explore and objectively evaluate all reasonable alternatives," and briefly discuss the reasons for the exclusion of alternatives eliminated from detailed study. Druid Hills, 772 F.2d at 713 (citing 40 C.F.R. § 1502.14(a),(b)).

However, the procedural requirement that alternatives be considered is "bounded by some notion of feasibility. " Citizens for Smart Growth, 716 F. Supp. 2d at 1225 (citing Druid Hills, 772 F.2d at 713 (quoting Vermont Yankee, 435 U.S. at 551. "Common sense . . . teaches us that a detailed statement of alternatives cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man." Citizens for Smart Growth, 716 F. Supp. 2d at 1225 (quoting Vermont Yankee, 435 U.S. at 551). Rather, "an EIS is satisfactory if the treatment of alternatives, when judged against a 'rule of reason,' is sufficient to permit a reasoned choice among the various options." Citizens for Smart Growth, 716 F. Supp. 2d at 1225.

The Amicus FWW's allegations that the Federal Defendants did not consider other alternatives is not supported by the record. In addition to the IFQ program eventually adopted by the

Federal Defendants for Amendment 29, the Federal Defendants considered an endorsement alternative, allocation privileges, auctioning of the initial quota shares, and maintaining the *status quo*. The *Amicus* FWW argues that endorsements were the preferred alternative because it would help reduce the bycatch of sea turtles. Therefore, the *Amicus* FWW argues the Federal Defendants violated the NEPA by selecting the IFQ alternative over the endorsement alternative, which it believes would be the most ecologically sound choice. An endorsement program would grant recipients under specific conditions an endorsement that would allow them to fish for grouper and tilefish in the Gulf Reef Fishery during specified periods.

Contrary to the *Amicus* FWW's argument, the FEIS contained over twenty (20) pages of detailed consideration and alternative analysis regarding the use of endorsements rather than the IFQ program adopted by the Federal Defendants. The Federal Defendants consideration of the alternatives in this instance was well within the agency's discretion and it followed the procedural requirements of NEPA that the agency take a "hard look" at the alternatives to the proposed action. The Federal Defendants considered the endorsement plan but rejected it stating that endorsements would increase grouper bycatch and discard mortality rates, create derby like fishing conditions in the long term, and while it would be effective in the short term at reducing the impact of overcapitalization, over time overcapacity situations could reappear. (Ar. 13019-13027,13123-13125). Thus, when judged against the rule of reason established in NEPA, the Federal Defendants consideration of the endorsement alternative was sufficient to permit a reasoned choice in favor of the IFQ program.

The Federal Defendants also considered an auction alternative. An auction alternative would allow participants to bid on shares of the grouper and tilefish harvest. The auction system was

rejected by the Federal Defendants because they did not believe the fishermen currently in the fishery would pay for a resource that they previously utilized for free.  The Federal Defendants further noted that an auction alternative would open the fishery to individuals that did not previously have reef permits.  The Federal Defendant's found that the auction alternative would have negative impact on the fishermen who had been actively participating in the grouper and tilefish fishery because they would not receive any consideration for their past participation in the fishery when bidding on a share in the harvest of grouper and tilefish. (Ar. 12976).  The auction alternative would also provided an unfair advantage to those who had greater financial resources than smaller participants.  (Ar. 12918).

Finally, the Federal Defendants considered maintaining the *status quo*.  The status quo or no action alternative would continue to manage the grouper and tilefish sector using a combination of permit moratorium, quotas, season closures, minimum size limits, and trip limits.  (Ar. 12847).  However, the no action alternative would continue to have the same environmental/biological impact that existed in the grouper and tilefish fishery prior to the issuance of Amendment 29.  The Federal Defendants stated that under the no action alternative, the fishery would remain overcapitalized and would continue to promote derby style fishing which would adversely affect the biological and ecological environments by reducing the ability of the fishermen to avoid or minimize incidental catches of other reef fish species. (Ar. 13068).  The Federal Defendants also concluded the *status quo* would also continue increased operation costs, higher levels of capitol investments, shortened seasons for grouper and tilefish, limit safety at sea, cause fluctuations in supply, and depressed ex-vessel prices. (Ar. 13068-13069).  After a thorough review, the Federal Defendants concluded that maintaining the *status quo* would not produce the OY for the grouper and tilefish fishery.

The Supreme Court has stated that "[a] court can only find a federal agency's attempted NEPA compliance inadequate where it is arbitrary, capricious, or an abuse of discretion" in violation of the APA.  Citizens for Smart Growth, 716 F. Supp. 2d at 1225.  The record here is clear that the Federal Defendants thoroughly evaluated the consequences of an endorsement alternative, an auction alternative, and maintaining the *status quo* in contrast to the final IFQ program.  As such, the Federal Defendants determination was not arbitrary, capricious, nor an abuse of discretion and therefore, did not violate NEPA.

### (iii) Whether the Purpose and Need Statement of Amendment 29 was to Narrow

"The statement of a project's purpose and need is left to the agency's expertise and discretion, and we defer to the agency if the statement is reasonable." Citizens for Smart Growth, 716 F. Supp. 2d at 1223 (quoting  Alliance for Legal Action v. FAA,  69 Fed. Appx. 617, 622 (4th Cir. 2003) (citing Friends of Southeast's Future v. Morrison, 153 F.3d 1059, 1066-67 (9th Cir.1998))). "The reasonableness of a given statement of purpose and need depends first on the nature of the proposed federal action." Citizens for Smart Growth, 716 F. Supp. 2d at 1223. Courts evaluate the reasonableness of an agency objective "with considerable deference to the agency's expertise and policy-making role." Id. (citing City of Alexandria v. Slater, 198 F. 3d 862, 867 (D.C. Cir.1999)). However, NEPA requires that agencies "may not define the objectives of an action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action," making the EIS a "foreordained formality." Citizens for Smart Growth, 716 F. Supp. 2d at 1223 (citing Citizens Against Burlington, Inc. v. Federal Aviation Administration, 938 F.2d 190, 196 (D.C. Cir.1991)). NEPA nevertheless does not require that agencies state the goals of the action in the broadest

possible terms. <u>Citizens for Smart Growth</u>, 716 F. Supp. 2d at 1223. Rather, "once an agency has considered the relevant factors, it must define goals for its action within the range of reasonable choices." <u>Id.</u> The agency's choice of a project's goals is, "like all agency decisions to which we owe deference, [reviewed] on the grounds that the agency itself has advanced." <u>Id.</u> (citing <u>SEC v. Chenery Corp.</u>, 332 U.S. 194, 196, 67 S. Ct. 1575, 91 L. Ed. 1995 (1947)).

The *Amicus* FWW argues that Amendment 29 is too narrow in purpose because it is aimed at the economic allocation of the fishery resources, not conservation and management as required by the MSA. The *Amicus* FWW argues that the rationalization of Amendment 29 was aimed at squeezing out the smaller-scale fishermen in favor of larger operations. FWW argues that the purpose and need preordains that only one option, its preferred endorsement alternative, is the best choice from among the alternatives. *Amicus* FWW claims the improperly narrow purpose is evident in how the amendment fails to give adequate consideration to the number of other viable options such as endorsements or an auction alternative.

The stated purpose of Amendment 29 is to "rationalize effort and reduce overcapacity in the commercial grouper and tilefish fisheries in order to achieve and maintain optimum yield (OY) in these multi-species fisheries." (Ar. 12936). The Federal Defendants expressed the need for such an amendment – like Amendment 29 – arose because of the overcapitalization of the grouper and tilefish fishery. Under the prior management system, the Federal Defendants noted that the deep water grouper (DWG) fishery had closed on July 15, 2004, and as early as May 10, 2008. (Ar. 12936). In effect, the DWG fishery was prematurely closed fifty percent (50%) of the time over a five year period dating back to the year 2003. (Ar. 12936). Similarly, the tilefish fishery was closed sixty-five percent (65%) of the time from 2003 through 2008. (Ar. 12936). The Federal Defendants

noted that the derby style fishing prompted by the prior "suite of management measures" would

continue unless changes were made in how the fishery was managed. (Ar. 12936).  The Federal

Defendants noted in pertinent part:

> [i]t is expected that incentives for overcapitalization and derby fishery
> conditions would be maintained as long as the current management
> structure persists.  Under this scenario, the commercial grouper and
> tilefish fisheries are expected to continue to be characterized by
> higher than necessary levels of capitol investment, increased
> operating costs, increased likelihood of shortened seasons, reduced
> as-sea safety, wide fluctuations in domestic grouper and tilefish
> supply and depressed ex-vessel prices; leading to deteriorating
> working conditions and lower profitability for the participants.

(Ar. 12936).  The Federal Defendants did not define the purpose of Amendment 29 as an IFQ but,

as noted above, considered several different alternatives before determining that an IFQ program best

suited their needs.

As for the Federal Defendants using the IFQ program to reduce the number of individuals

that use the fishery, the MSA gives the Federal Defendants' the authority to initiate limited access

fishing programs that limits the number of fisherman eligible to harvest fish in a particular fishery.

16 U.S.C. § 1853a(a). Furthermore, simply because the Federal Defendants' Amendment 29 action

may have had an adverse economic impact on some of the fishermen in the Gulf Reef Fishery does

not mean they violated NEPA.  Courts have found that whether or not the agency ends up taking a

"major federal action" has nothing to do with NEPA compliance. Van Antwerp, 526 F. 3d at 1361.

NEPA is procedural, setting forth no substantive limits on the agency decision-making. Id. (citing

Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350, 109 S. Ct. 1835, 104 L. Ed. 2d

351 (1989).  For example, in Sierra Club v. Van Antwerp, the Eleventh Circuit went so far as to state

that even if the EIS, in that case, had concluded that the issuing of the permits at issue in that case would have destroyed the entire Florida Everglades, NEPA would not have been violated as long as the procedural process was followed. 526 F. 3d at 1361-62. Thus, limiting fishermen from the Gulf Reef Fishery in and of itself does not violate NEPA as alleged by FWW because the Federal Defendants have that authority and NEPA's procedural process was followed.

Instead of narrowing the purpose of Amendment 29 through an arbitrary and capricious determination, as argued by FWW, the Federal Defendants clearly considered several alternatives as well as different variations and impacts of those alternatives on the environmental, social, and economic areas of concern within the Gulf Reef Fishery. The Federal Defendants then made a reasoned decision based upon the facts, comments, and studies performed for each of the proposed amendments. As such, the Court must defer to the Federal Defendant's decision and respectfully recommend that the Federal Defendants' purpose and need statement was not too narrow and compiled with NEPA and the MSA.

### *(8) Whether Amendment 29 Violates the Regulatory Flexibility Act*

The Plaintiff's Lewis and Fussell argue the Federal Defendants violated the Regulatory Flexibility Act (RFA) and Executive Order (E.O.) 12866 by failing to keep the fishermen informed of the progress and plans for Amendment 29.

### *(a) Executive Order 12866*

E.O. 12866 requires the Federal Defendants to follow the RFA. Initially, the Court notes that neither the original Complaint nor the Amended Complaint filed by Lewis and Fussell contained a count alleging a violation of E.O. 12866. The claim is being raised for the first time in the Plaintiffs' brief for summary judgment.

It should be noted that jurisdiction may not be sustained on a theory that the Plaintiffs have not advanced. Merrell Dow Pharmaceuticals v. Thompson, 478 U.S. 804, 810 n. 6, 106 S. Ct. 3229, 92 L. Ed. 2d 716 (1986).  Congress gave the federal courts jurisdiction to hear, originally or by removal from a state court, only those cases in which a well pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law. Id. at 807 n. 2.  Since the Plaintiffs Lewis and Fussell did not include a claim in their Amended Complaint alleging a violation of E.O. 12866, this Court lacks any basis to hear such a claim.

Nevertheless, even if the Plaintiffs Lewis and Fussell had included the claim in the Amended Complaint, the claim would be futile because E.O. 12866 specifically prohibits a private cause of action based on the Executive Order.  The Order reads in pertinent part:

> [n]othing in this Executive order shall affect any otherwise available judicial review of agency action. This Executive order is intended only to improve the internal management of the Federal Government and does not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

E.O. 12866 § 10.  Therefore, Lewis and Fussell have no right of action to challenge the Federal Defendants action in issuing Amendment 29 pursuant to E.O. 12866.

### (b) Regulatory Flexibility Act

The Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601-612, as amended by Title II of Public Law 104-121, the Small Business Regulatory Enforcement Fairness Act ("SBREFA"), requires federal agencies to consider potential impacts of their rules on small entities. Under the RFA, agencies must conduct a regulatory flexibility analysis to analyze possible effects of a proposed

rule on small businesses, unless the agency certifies that the "rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b).

The Plaintiffs Lewis and Fussell argue that the Federal Defendants failed to comply with the RFA because they failed to comply with 5 U.S.C. § 602(a)(1,2) by not publishing as required in the Federal Register during the months of October and April each year the description and summary of Amendment 29.  The Plaintiffs Lewis further contend that the Federal Defendants failed to comply with 5 U.S.C. § 602(b) by not transmitting the Amendment 29 agenda to the Chief Council for the Advocacy of the Small Business Administration for comment.  It is also their contention that the Federal Defendants failed to certify or publish that there was not "significant economic impact on a substantial number of small entities" pursuant to 5 U.S.C. § 605(b), which then would have compelled Defendants' compliance with 5 U.S.C. §§ 603 and 609. In addition, they claim the Federal Defendants failed to comply with 5 U.S.C. § 603(a) by not transmitting the initial regulatory flexibility analysis to the Chief Council for Advocacy of the Small Business Administration.  They state that by failing to transmit the initial regulatory flexibility analysis to the Chief Council for Advocacy of the Small Business Administration, the Federal Defendants failed to comply with 5 U.S.C. § 609.

5 U.S.C. § 602(a) requires federal agencies to file in the Federal Register a brief description of the subject area of any rule the agency expects to propose or promulgate which is likely to have a significant economic impact on a substantial number of small entities.  The FEIS acknowledges that the fishermen involved in the Gulf fishery were mostly small businesses and contains a detailed discussion of the impact upon those small businesses. (Ar. 13175-13177).  Moreover, the RFA could not prevent the Federal Defendants from proceeding forward with Amendment 29, even if the

Federal Defendants had not considered the impact upon the small businesses.  Under 5 U.S.C. §

602(d), "[n]othing in this section precludes an agency from considering or acting on any matter not

included in a regulatory flexibility agenda, or requires an agency to consider or act on any matter

listed in such an agenda." Thus, the Federal Defendants could act on Amendment 29 with or without

compliance of § 602(d) of the RFA.

      Whether or not the Federal  Defendants filed a copy of the proposed rule and its impact with

the Chief Council for the Advocacy of the Small Business Administration pursuant to 5 U.S.C. § 603

is not reviewable by this Court. 5 U.S.C. § 611(a)(1).  Nevertheless, the Federal Defendants state that

copies of Amendment 29 were provided to the Chief Council for the Advocacy of the Small Business

Administration. (Doc. # 71) (citing Ar. 12338).

      The Plaintiffs Lewis and Fussell's allegation that the Federal Defendants failed to comply

with 5 U.S.C. § 605(b) also lacks merit.  The RFA allows the Federal Defendants to skip the

requirements of § 605(b) if the agency asserts that the rule will not have a significant economic

impact on a substantial number of small entities, however, most of the fishermen affected by

Amendment 29 were small businesses so a report published in the federal register would be required.

The Federal Defendants prepared both Initial Regulatory Flexibility Analysis (IRFA) and Final

Regulatory Flexibility Analysis (FRFA) discussing the economic impacts on the small business

entities which were published in 74 Fed. Reg. 20141 on April 30, 2009. (Ar. 12361).  Thus, the

Federal Defendants complied with the RFA under 5 U.S.C. § 605(b).

      The RFA also requires the agency to allow a comment period for small business entities to

comment on the economic impact of the proposed rule on their respective enterprises. 5 U.S.C. §

609.  The comment requirement pursuant to 5 U.S.C. § 609 is subsumed for judicial review into a

claim under § 604. 5 U.S.C. § 611(a)(1).  Thus, the Court cannot review the Plaintiff's RFA claim

for violating the RFA under 5 U.S.C. § 609.  However, the RFA does require a final regulatory

flexibility analysis to be prepared and submitted to the public for comments. 5 U.S.C. § 604.  The

Federal Defendants included an economic impact analysis in the FEIS. (Ar. 13175-13177).  The

FEIS was submitted to the public for comment and the comments and responses were added to the

FEIS. (Ar. 13214-13217).  Thus, the Federal Defendants complied with § 609 through their

compliance with RFA § 604.

**CONCLUSION**

In determining to implement the grouper and tilefish IFQ, the Federal Defendants, the Gulf

Council and the NMFS examined several viable alternatives including the impact of those

alternatives and sub-alternatives would have upon the social, economic and environmental

conditions in the Gulf states region.   At the end of that lengthy process, the Federal Defendants

implemented Amendment 29, in order to manage the Gulf of Mexico's Reef Fish Fishery,

particularly the grouper and tilefish commercial sector, and prevent the overcapitalization of the

grouper and tilefish fishery which was causing higher than necessary levels of capital investment,

increased operating costs, increased likelihood of shortened seasons, reduced safety at sea, wide

fluctuations in grouper supply, and depressed ex-vessel values.  For the reasons detailed above, this

Court respectfully recommends that in implementing Amendment 29, the Federal Defendants were

consistent with the ten (10) national standards listed in the MSA, complied with the APA, NEPA,

RFA, and the United States Constitution.  As such, any injunctive relief requested by the Plaintiffs

in their respective memoranda of law should be denied and summary judgment should be found in

favor of the Federal Defendants and the Intervenor Defendants, the Environmental Defense Fund, and the Gulf of Mexico Reef Fish Shareholders' Alliance.

Accordingly, it is now

**RECOMMENDED**:

(1) The Plaintiffs, Brian E. Lewis and Troy Fussell's Motion for Summary Judgment (Doc. # 61) should be **DENIED.**

(2) The Plaintiff Coastal Conservation's Motion for Summary Judgment (Doc. #64) should be **DENIED**.

(3) The Defendants, Gary Locke, in his official capacity as Secretary of the United States Department of Commerce, the National Oceanic and Atmospheric Administration; The National Marine Fisheries Services's (Federal Defendants) Cross Motion for Summary Judgement (Doc. # 68) should be **GRANTED**.

(4) The Intervenor-Defendants, the Environmental Defense Fund, and the Gulf of Mexico Reef Fish Shareholders' Alliance's Motion for Summary Judgment (Doc. # 71) should be **GRANTED.**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this __16th__ day of August, 2011.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies:  All Parties of Record

-76-